1838.

Dutch Church
in Garden-St.
v.
Mott.

</div>

---

## THE REFORMED PROTESTANT DUTCH CHURCH IN GARDEN-STREET *vs.* MOTT and others.

The statute of Elizabeth relative to charitable uses was never in force in the state of New-York. But independent of that statute the court of chancery had an original jurisdiction to enforce and compel the performance of trusts for pious and charitable uses, when the devise or conveyance in trust was made to a trustee capable of taking the legal estate.

The conveyance to certain individuals, of the site of the Dutch Church in Garden-street, in the city of New-York, in 1691, in trust for the use of the ministers, elders and deacons of such church and their successors, and to have a house of public worship erected thereon and for no other use whatever, was a valid conveyance at the common law to a charitable and pious use; and the court of chancery has original jurisdiction to enforce the performance of the trust. No violation of the trust upon which the property was conveyed, therefore, can have the effect to revest either the legal or equitable title to the property in the heirs of the original grantor.

Where real estate is conveyed to trustees in trust for the use of a church or congregation, as a place of worship, which church or congregation is afterwards incorporated, the court, after a great lapse of time, will presume a conveyance from the original trustees, or their heirs, to the corporation.

An act of the legislature by which the legal title of a mere naked trustee is declared to be transferred to and vested in the cestui que trust, who previously had the power to compel such transfer by an application to the proper tribunal, is constitutional and valid. Where therefore, real estate was held by individuals in trust for a Dutch church, which was incorporated previous to the passage of the act of March, 1801, relative to religious corporations, the effect of that act was, to transfer the legal title to such estate from the trustees directly to the corporation.

The act relative to religious corporations gives to such corporations an unlimited power to convey real estate which is held in trust for the corporators; provided the consent of the court of chancery to the alienation is given, as authorized by that act.

A bill for a specific performance is not to be dismissed upon the mere ground that the complainant's title was not perfect at the time of filing such bill;

1838.

Dutch Church
in Garden-St.
v.
Mott.

although the defendant may be entitled to costs, where he has made no unreasonable objections to the title. A specific performance may be decreed if it appears by the report of the master that the complainant is then in a situation to give a perfect title, except in cases where the purchasers have been materially injured by the delay.

January 22.

THE bill in this cause was filed, to compel the specific performance of a contract of sale to the defendants of a lot in the city of New-York, a part of the site of the Low Dutch Church in Garden Street, destroyed by the great fire in 1835. The only question in controversy between the parties was as to the power of the complainants to give to the defendants, as purchasers, a perfect and unincumbered title to the premises. The cause was brought to a hearing upon bill and answer, and upon certain documentary evidence referred to in the bill and admitted in the answer; and was argued in June 1837, by

*Geo. Wood*, for the complainants, and

*Henry R. Storrs*, for the defendants.

THE CHANCELLOR. To understand the various questions raised on the hearing, and which were so fully and ably discussed in this case, it is necessary to advert to the early history of the title under which the complainants claim the right to sell and convey the premises in question, for the benefit of their church and congregation, under the order of this court authorizing a sale. It appears that on the 18th of February, 1691, the corporation of New-York conveyed to Samuel Bayard a lot on the north side of Garden Street, now Exchange Place, being 180 feet in front on the street, and including the premises in question in this cause. And that a few days thereafter, S. Bayard conveyed the same premises to S. Van Cortlandt, N. Bayard and J. Kipp in fee; for the purpose of having a church or suitable building erected thereon, for the common use of the Ministers, Elders and Deacons of the Low Dutch Church, which then were or at any time thereafter should be within the city of New-York, professing the canons of the national synod of Dort; as well for the public and solemn worship of God, as the exhorta-

tion and instruction of the people of that church in and to true religion and virtue. The conveyance was declared to be in trust, that the grantees and their heirs and assigns should keep, enjoy, possess and hold the lot and premises thereby conveyed, to and for the general use of the ministers, elders and deacons of such Low Dutch Church and their successors, and to no other use or uses whatever. This was unquestionably a valid conveyance to a charitable or pious use, at the common law ; and vested the legal title to the premises in the trustees, absolutely and irrevocably, to and for the secondary uses therein declared. And this court, independent of the statute of Elizabeth relative to charitable uses, which was never acted upon in this state, had an original jurisdiction to enforce and compel the performance of the trust. As the statute of Elizabeth had a retro-active effect, and as we have very few reports in chancery previous to that time, it is difficult to find adjudged cases on this subject which are not in some way dependent upon the provisions of that statute. This fact had led some judges to suppose the court of chancery had no jurisdiction on the subject previous to that time. The general jurisdiction of this court, however, to compel the grantee of the legal estate to apply it to the use of the individuals for whom it was intended by the grantor, was well established long before that time. It is also a matter of history, that during the protracted struggle between the different princes of the red and of the white rose for the national sovereignty, much of the landed property in England was held under conveyances which could only be made available to its real owners by the exercise of such a jurisdiction. And as devises, donations and bequests to pious and charitable uses, which were well known to the civil law, were common in England, long before the statute of Henry the eighth had turned ordinary uses into legal estates, it would indeed be strange if the court of chancery had not at that time assumed the same jurisdiction over conveyances and bequests to charitable and pious uses, as it had over conveyances to the use of particular individuals. There is one case that I have been able to find, decided in 1581, nearly twenty years before

1838.

Dutch Church
in Garden-St.
v.
Mott.

the passing of the statute of charitable uses, which shows clearly that the court of chancery was in the habit of sustaining defective conveyances to charitable uses, as a part of its ordinary jurisdiction, previous to the statute 43d Elizabeth. I refer to the case of the charitable use under the will of *Symons,* the Winchester alderman; where Lord Chancellor Bromley compelled the heir to execute a conveyance of real estate devised to a charitable use, in conformity to the intention of the testator; the deed of bargain and sale which the testator himself had executed to the trustee, being void for want of enrolment. (*Duke on Char. Uses,* 163.) The case of *The Mayor & Burgesses of Reading* v. *Lane,* (*Toth.* 32,) decided the same year the statute was passed, was also most probably a case depending upon the general jurisdiction of the court as it existed before the statute; as it is hardly possible that a case could have gotten before the court upon an appeal from a decision of commissioners appointed under the statute, at so early a day.(*a*)

In 1696, the persons for whose use this conveyance in trust was made, were duly incorporated by a royal charter, by the name of *The Ministers, Elders & Deacons of the Reformed Protestant Dutch Church in the City of New-York;* for the avowed purpose, among other things, of enabling them to hold this property for the uses to which it had been conveyed to the trustees. And this and other property was in and by that charter confirmed to them by the representatives of the crown. Although this confirmation was not necessary to to give the church and congregation the use of the property vested in their trustees, it probably was considered necessary to enable the corporation to take and hold the legal title; as the annual value of other property which the corporation might thereafter purchase or acquire was limited by the charter. And such confirmation certainly is evidence from which a presumption may arise, after a lapse of 140 years, that the trustees actually conveyed the legal title to such corporation. The case of the corporation of *Reading* v. *Lane,* above referred to from *Tothill,* and which is likewise

(*a*) See the case of *Morden College, C. P. Cooper's Rep.* 36.

reported by Duke, is also a case in point to show that where there was an appropriate corporation, whose general duty it was to administer the charitable use, and which was legally authorized to hold the legal title and to receive and apply the rents and profits accordingly, this court had the power to compel a conveyance of the trust property to such corporation. Although the defendants therefore have no knowledge of the execution of a conveyance by the trustees to the corporation which was subsequently lost, and do not admit the same, yet as the corporation has always possessed and enjoyed the property, and as there was no reason whatever for keeping the legal title in the original trustees, or their heirs, after the confirmation thereof to the *cestue que trusts* as a corporation by the charter of 1696, the legal presumption is that such a conveyance was executed by the trustees, as alleged by the complainants.

Independent of such legal presumption, however, the 4th section of the act of March 1801, to provide for the incorporation of religious societies, (1 *R. L. of* 1801, *p.* 339,) was sufficiently comprehensive in its terms to transfer the legal title of this property from the heirs of the original trustees to the corporation, if it had not before been conveyed. The second section of that statute declared that the ministers, elders and deacons of every reformed dutch church or congregation then existing, or thereafter established, should be the trustees thereof; and it authorized such congregations as were not then incorporated, to incorporate themselves in the manner therein prescribed. The 4th section then provided that the trustees of any church, congregation or society previously mentioned in the statute, which of course included this church or congregation incorporated in 1696 and recognized in the same section as an existing corporation, might take into their possession and custody all the temporalties, and might recover, hold and enjoy all the debts and real and personal estate belonging to the church, congregation or society, *in whatsoever manner the same might have been acquired, or in whose name soever the same was held,* as fully and amply as if the right or title thereto had been originally vested in such trustees. The necessary

1838.

Dutch Church
in Garden-St.
v.
Mott.

effect of this statute therefore was to transfer to this corporation the legal title to all property which was then held in the name of others upon a mere naked trust for the use of the church or congregation, or of the corporators. That the legislature had the power to transfer the legal title from the mere naked trustees to the cestui que trusts, after the latter were incorporated, in a case where the trustees might themselves be compelled to make such a transfer under a decree of this court, there cannot be any room for doubt. (See 1 R. S. 727, § 47; *Morgan & others* v. *Leslie, Wright's Ohio Rep.* 144.) There is no doubt therefore in the present case, that previous to the separation of the complainants from the collegiate churches, in 1812, the legal as well as the equitable title to the premises in Garden street was absolutely vested in the corporation of such collegiate churches, for the use of its corporators. And no subsequent violation of the trust upon which the property was held, can ever revest either the legal or equitable title in the heirs of Samuel Bayard, or in the heirs of the original trustees; although a palpable breach of trust might form a proper ground for an application to the court of chancery, on the part of the corporators, or by the attorney general, to compel the due execution of the trust. This therefore disposes of the first objection to the complainants' title.

The complainants having become incorporated as a separate and distinct church or society, in 1812, under an agreement with the remaining branch of the original church or society, the corporation of the collegiate churches, in 1813, gave to them a lease of the church and premises in Garden street for the term of 999 years, upon a peper-corn rent, to hold the premises as a site for a church and as a place of interment; subject to various restrictions and conditions for the purpose of rendering the use of the premises, and the doctrines and discipline of the church which should worship there, conformable, as far as might be, to the original trusts upon which the property was held. But after the destruction of the church by the great fire, the corporation of the collegiate churches conveyed to the complainants the absolute title to the premises, for a full consideration of

$100,000. It is not necessary therefore to enquire here whether the severance of the church property and the lease of this part of it to the complainants, was such a violation of the trust upon which the property was held as to have authorized any of the corporators of the collegiate churches to interfere. I am inclined to think it was ; as no application was made to this court to sanction such a transfer of the property, without consideration, and upon trusts different from those upon which the property was held by the terms of the original charter and of the act of 1801 before referred to. There is no doubt, however, that the legal title to the premises passed to the new corporation for the 999 years by virtue of that lease. There was no law in force at that time to prevent a corporation, or any other trustee, from conveying the legal title to property held in trust, in such manner as to vest it in the grantee, subject to the equitable right of the cestue que trust to reach and control the same at any time afterwards by the power of this court, if the land had not passed into the hands of a bona fide purchaser discharged of the trust. The complainants' title to the property does not depend upon the validity of the lease of 1813, but upon the conveyance of 1836. For that reason also it is perfectly immaterial whether the yearly value of the property in 1813, was more or less than the sum of $3000 ; that being a much less sum than the amount to which the complainants were restricted when the deed of 1836 was executed.

I apprehend that the complainants' counsel has entirely misunderstood the intent and meaning of the act of March 1806, authorizing religious corporations to convey their corporate property under the sanction of the chancellor. (*Laws of* 1806, *ch.* 43, § 4.) At the common law every corporation aggregate had an unlimited power over its property, and might alienate the same in fee, or grant any lesser estates therein, without limitation or restriction. (*Coke Litt.* 44 *a*, 300 *l; Smith* v. *Barrett*, 1 *Siderf.* 161 ; *Per. L. Mansfield*, 1 *Bur. Rep.* 221.) And the same general power as to corporations, is recognized in the recent revision of the laws of this state. (1 *R. S.* 599, § 1,

*sub.* 4.) Certain statutory provisions had, however, been enacted in England, at a very early day, to restrain the alienation of church property, which fact was sufficient to render it doubtful whether they were not applicable to church property here. But the principal difficulty which existed, was the general power which this court had, to control the application of property given or devised to corporations and others for charitable uses, so as to render the legal estate in the hands of a purchaser, with notice of the trust, chargeable with the charitable use to which it was originally devoted. And as the law of patronage had never been extended to this state and was inconsistent with the spirit of our institutions, it became necessary to vest in some tribunal the power of sanctioning alienations of church property, for the benefit of those who were the real owners of the same, and to direct a new investment of the proceeds, without the expense and delay of an application to the legislature in every particular case. I have no doubt therefore that the intention of the act of March, 1806, was to give to every religious corporation an unlimited power to convey any real property held by them in trust for the corporators; provided the previous consent of this court to such alienation of the church property, and a direction for the proper application of the proceeds thereof for the benefit of the corporators was obtained, in the summary mode which is there prescribed.

If such a sanction of the sale of the premises in question to the complainants, and a proper direction for the investment and application of the purchase money had been given in this case, previous to the conveyance of May 1836, I should have compelled the defendants to take this title notwithstanding the other objections thereto. But as the statute had prescribed the mode in which the sanction of this court to a conveyance of property by a religious corporation should be obtained, I have great doubts whether the subsequent ratification of the sale was sufficient to give a perfect title, discharged in equity of the charitable trust or use. At all events it would be unreasonable to compel a purchaser to take such a title, when there can be but little doubt that the title can be made perfect at a trifling expense, in the usual

mode. From the statement in the bill, and the admission in the answer, it is evident that the annual value of the Garden Street property, in its present state, does not exceed the amount prescribed for the complainants' corporation in the act of 1819.

It is not a matter of course, however, to dismiss a bill for specific performance merely because the title was not perfect at the commencement of the suit; although that may be a sufficient reason for giving costs to the defendant, if he has not made any unreasonable objection to the title. A specific performance may be decreed, if it appears by the report of a master that a perfect title can be made to the purchaser at the time of making such report, unless the purchaser has been materially injured by the delay.

It must therefore be referred to Master Codwise to inquire and report whether the complainants are now able to make a perfect title to the defendants of the lot in controversy. And upon the coming in of the master's report, if it appears that a perfect title can then be made, there must be a decree for a specific performance, upon payment of costs to the defendants. But if such conveyance of a good and unincumbered title cannnot be made, the bill must be dismissed with costs.