## SHOTWELL, Executor, &c. *v.* MOTT and others.

Where a testator directed his executors to sell his lands and to distribute the proceeds amongst various persons together with sundry charitable institutions; it was *held* that there was a conversion of the real estate and the gifts were to be treated as legacies.

It was also held, that if they were to be deemed land, they were nevertheless valid, because the revised statutes relative to Uses and Trusts, do not apply to Charitable Uses.

A bequest for the use of the poor of a town, and one to an unincorporated religious association for the use of its poor ministers, are not within the provisions of the statutes against perpetuities.

Charitable uses were bestowed in England, and were recognized by law, before the Norman conquest; and they were always fostered and protected by the common law. They were subject to the jurisdiction of the court of chancery long before the statute of Charitable Uses, 43d Elizabeth; and this, whether the trustees were a corporation or individuals, and whether the gift were to trustees by name, or for a definite and specific object without naming trustees.

The revised statutes against perpetuites and regulating uses and trusts, were aimed at private trusts and accumulations for remote posterity. Public trusts and charitable uses were not within the intention of the legislature, or the spirit and object of the enactment.

The English statute of Uses, 27 Henry VIII., did not apply to public uses or charities.

A bequest for the benefit of poor ministers of a specified religious denomination, is valid, though it does not appoint the trustees of the fund. And it is competent for the testator to empower the executors and trustees of his will to designate the first trustees of such fund. If it were otherwise, the trust would remain and the court of chancery would appoint the trustees.

A bequest for the ministers of the New York Yearly Meeting of Friends called Orthodox, who are in limited and straitened circumstances, is not too vague or uncertain, or too indefinite in its objects.

So of a bequest for the relief of such indigent residents of the town of Flushing, as the trustee or trustees of the town for the time being should select.

Both gifts were held to be valid.

April 2; August 6, 1844.

THE bill in this cause was filed by the sole acting executor of Nathaniel Smith, late of Flushing, deceased, for a construction of his last will and testament, and for directions as to the disposal of the residue of his estate. The will bore date the 22d of May, 1833, and the testator died in 1835.

It made numerous bequests for charitable purposes, which were not questioned.

He directed his executors, as soon as conveniently might be after the death of his wife, to sell his house and lot in Broadway, in New York, and to distribute the net proceeds among sundry legatees and benevolent institutions; among which dispositions were the two following, which were controverted.

" The sum of four thousand dollars to my said friends, Benjamin Clark, Joseph S. Shotwell, Samuel Parsons, and William F. Mott," (who were his executors,) " or to the survivors or survivor of them, or to the executors or administrators of such survivor, to be invested or placed at interest in the names of suitable trustees, and under such regulations that the interest or income thereof may be distributed and divided annually forever under the direction of the New York Yearly Meeting of Friends called Orthodox, unto and among such Orthodox ministers of such society in limited and straitened circumstances, especially those who travel in the ministry, as the said meeting, or its committee, shall, for that purpose, name and designate; such interest or income to be distributed during the sittings of said yearly meetings annually forever; and as I hold the privilege of attending our yearly meetings to be very important to many pious and worthy ministers, and believe that small pecuniary aid to such as are in limited and straitened circumstances would enable them to enjoy that great privilege, and hope that others may think well of the example, and may thereby be induced to make similar bequests, it is my wish that this legacy or appropriation of four thousand dollars to be invested or placed at interest, shall be so invested as to perpetuate in the society the knowledge of my great desire for its growth and prosperity, and to which end I wish that the existence of the fund, together with the name of its founder, and also its object, shall be publicly made known annually forever by the yearly meeting."

The other was a bequest of four thousand dollars to the executors by name, " or to the survivors or survivor of them, or to the executors or administrators of such survivor, to be invested permanently in such way and manner that the interest or income thereof may be appropriated annually forever as follows : that is

to say, for the relief of such indigent persons residing in the *township of* Flushing aforesaid, as the trustee or trustees for the time being shall select for that purpose, one hundred dollars thereof in fuel, one hundred dollars thereof in money, and the residue in bibles, testaments, tracts, and other religious books at a low price, the bibles and testaments to be purchased of the said Bible Association of Friends in America, if they can be procured from that institution on as good terms as from the American Bible Society, otherwise they are to be procured from the American Bible Society or elsewhere, and the surplus to form part of my residuary estate."

The residuary bequest in the will was to the executors in trust for an institution in Philadelphia known as the Bible Association of Friends in America, the American Bible Society, and the American Tract Society. And he provided that in case any of his bequests should fail by reason of misnomer, the incapacity of the legatees to take, or otherwise, he gave all such bequests to his executors absolutely, trusting that they would apply them according to his intent and meaning.

After the widow of the testator died, the executors sold the house and lot in Broadway for nearly $18,000. The bequests which were payable out of the proceeds, were $26,000. The executor also had remaining the residue of the personal estate, about $2700.

The various legatees and next of kin of the testator, were made parties to the suit. The American Bible and Tract Societies, by their answers insisted that the bequests to the Orthodox Yearly Meeting, and to the poor of Flushing, were invalid and illegal; and that the sums given to those objects should fall into and become a part of the residuary estate to which those societies were entitled.

The Association for the Relief of Respectable Aged Indigent Females in the City of New York, made the same objection to the bequests before particularly stated ; insisting that the same should in the first instance be applied to make good the respective valid legacies carved out of the proceeds of the Broadway house and lot.

The same ground was taken by N. Smith Prentiss, in behalf

of himself and other legatees for whom he was trustee, who were entitled to participate in the proceeds of that house and lot.

William F. Mott, one of the executors who did not qualify as such, answered, claiming that the amount of the two contested bequests if they were invalid, should be paid to the four persons named as executors, pursuant to the last paragraph of the will, absolutely, or with such limitations and directions as the court should think proper to comake, nsistent with the meaning and intent of the testator.

*M. S. Bidwell,* for the complainant.

*George Wood,* for the Orthodox Yearly Meeting and the Bible Society of Friends in Philadelphia.

*B. W. Bonney,* for the Town of Flushing.

*H. Holden,* for the American Bible Society and American Tract Society.

*P. A. Cowdrey,* for the Association for Respectable Aged Indigent Females.

*S. G. Raymond,* for N. Smith Prentiss and others.

THE ASSISTANT VICE-CHANCELLOR.—This suit is brought to obtain the direction of the court, and to settle the construction of the will of Nathaniel Smith, who resided in Flushing for a great many years prior to his decease.

It is urged on the part of several of the defendants, that the bequests for the benefit of the New York Yearly Meeting of Orthodox Friends, and for the relief of indigent persons in the township of Flushing, are invalid.

As most of the objections to these bequests apply equally to both, I will consider them together.

FIRST, It is insisted that all express trusts are abolished by the Revised Statutes, except those enumerated in the article

" *Of Uses and Trusts*," and that these trusts are not contained in that article.

The gifts in question are purely *Charitable Uses ;* and most if not all of the difficulty on this subject, has arisen from the mistaken idea in the courts of some of our sister states, and at one time in the Supreme Court of the United States, that the Court of Chancery in England derived its jurisdiction over this class of trusts, from the statute 43 Eliz. of Charitable Uses. There was some obscurity on this point prior to the publication by the Record Commission of the Calendars of proceedings in Chancery during the reign of Queen Elizabeth, with some examples before her reign ; although the weight of judicial authority vastly preponderated in favor of the existence of that jurisdiction at common law, long before the time of the Tudors.

That publication and the subsequent decisions have abundantly settled the question in favor of the jurisdiction. In my recent decision of the Lutheran Church cases in Schoharie county, (*Kniskern* v. *Lutheran Churches, &c.*,)(a) I had occasion to speak of this subject; and I will now dwell upon it no farther than to say that since writing my opinion in that cause, the decision of the Supreme Court of the United States upon the will of Stephen Girard has been published, and that court has declared that there is no longer any doubt upon the question. (*Vidal* v. *Girard's Executors*, 2 Howard's U. S. Rep. 196.) See also in this state, *Orphan Asylum* v. *McCartee*, 9 Cowen, 437, 477, per Jones, Chancellor; *Dutch Church in Garden-street* v. *Mott*, 7 Paige's R. 77 ; *Potter* v. *Chapin*, 6 id. 639 ; *Wright* v. *Methodist Church*, 1 Hoff. Ch. Rep. 202, 241.

And this jurisdiction was irrespective of the circumstance whether the trustees were a corporation or individuals, and whether the gift was to trustees by name, or merely for an object sufficiently definite and specific to be carried into effect.

Devises to ecclesiastical corporations and institutions, were restricted by various statutory provisions in England, and the

---

(a) Vol. 1st, pages 439, 562.

same restraint extended to charitable uses, (with the exception of certain colleges,) by the statute 9 Geo. II. ch. 36.

Until that statute was enacted, charitable uses, with the exception which I have stated, were not only tolerated, but fostered and protected by the common law.

They were engrafted into the Roman law concurrently with the growth of Christianity; and with the same benign influence, they became a part of the common law of England. They were recognized and in use before the Norman conquest.

We inherited from our mother country the law of charitable uses, with the blessed spirit that gave rise to it; and our land is filled with religious, literary and benevolent institutions, liberally endowed by that spirit and upheld by that law.

Did the revised statutes intend to cut off gifts and devises to charitable uses for all time to come? For if the article " *Of Uses and Trusts*" applies to charitable uses, that must have been the intention in respect of all save devises to corporations directly for their own use.

The proposition is startling, and of vast importance. And I presume every one on first hearing it, will declare that it is impossible; that no legislature in the nineteenth century could have intended such a result.

I do not think that such is to be the construction of the act.

That it was not the intention, clearly appears by the notes of the revisers accompanying this article when it was submitted to the legislature. They proposed sweeping and radical changes in the existing law of uses and trusts, and stated their reasons and objects fully and elaborately. But there is not one word upon the subject of charitable uses. They were treating wholly of private uses and trusts; of those intricacies and refinements in the dealings of individuals with real property, which had perplexed conveyances, and filled the courts with litigation. They proposed to cut up this class of estates by the roots, and the legislature adopted their suggestion and destroyed it most effectually.

But public trusts, and charitable uses, were not within the purview of the lawgivers. The evils which they sought to re-

medy, were not incident to those trusts. The provisions which they enacted for preserving what was useful and beneficial in private trusts, are inapplicable to the administration of charities.

If the bequests in question are within the statute of "Uses and Trusts," so are all gifts and devises to eleemosynary corporations. Those corporations take and hold property, in a great measure for public uses, not for the benefit of the corporators. The revised statutes ostensibly left the acts relative to religious and literary societies and libraries untouched. Yet if this construction is to prevail, they can no longer take real estate by donation, except as permitted by the act of 1840.

Applying the principle of construction, that the general words of a statute are to be limited to the subject matter, we are relieved from consequences so contrary to the public interests, and so repugnant to the spirit of the age.

The article, of Uses and Trusts, relates to private trusts. It was not intended to affect charitable uses or public trusts, which spring from benevolent instead of interested motives, and are for the benefit of classes of people not personally known to the benefactor, not for the pecuniary advantage of a designated individual.

A farther argument against this construction may be derived from the Statute of Uses, 27 Hen. 8th, ch. 10. The terms of that statute are abundantly sufficient to cut off all charitable uses, as well as the private uses which at that day were equally obnoxious to the arbitrary sovereign of England.

Yet it never appears to have been supposed that the statute of uses had any application to public charities, or that such uses could be executed under that act. The statute of 23 Hen. 8th, ch. 10, aimed at *superstitious uses*, continued to receive judicial construction on cases which arose subsequent to the 27 Henry 8th. Then followed the statute of 1 Edward 6th, ch. 14, (with its beautiful recital,) enacted against superstitious uses, and a long series of reported decisions thereon; a statute which was wholly unnecessary, if the statute of uses had any application to charities. Of these decisions I will only refer to *Pitt* v. *James*, Hobart's R. 123; *Adams' and Lambert's case*, 4 Reports, 96, 104, and the cases there stated; *Launcelot* v. *Adams*, Cro. Car. 248; and *Humphreys* v. *Knight*, ibid. 455.

A parish, before the statute 27 Hen. 8th, could not stand seised to uses, but such a gift, since the statute would be good as a trust for the parishioners, if not a superstitious use. See Saunders on Uses and Trusts, 90.

Mr. Cruise, in treating of uses, makes no allusion to charitable uses, but in the title " *Deed*" he says that before the statute 9 Geo. 2, ch. 36, (of mortmain,) lands might be given for the maintenance of a school, a hospital, or any other use of that nature ; in short, for every charitable use which was not expressly prohibited by the previous statutes of mortmain. (Cruise's Dig. title, Deed, ch. 2, s. 32, 33.)

This furnishes a strong argument against the extension of the provisions of our statute of uses and trusts to charities ; a species of trusts not within the intention of the legislature, or the spirit and object of the enactment.

Such, in brief, are my views on this important question. Without as yet deciding upon the validity of the two bequests on this ground, I will proceed one step farther in the argument.

The testator orders and directs the executor, as soon after the decease of his wife as could conveniently be done, to sell and dispose of his house and lot in Broadway, absolutely in fee simple ; and then to distribute and divide the net proceeds in the manner following, and *he gives the same accordingly*. The two bequests under consideration are among those to be paid out of the proceeds.

The gift, therefore, is not of land, but of the proceeds of land after the same is converted into money. The conversion is not made to depend on the payment of these bequests, nor can it depend on their validity, for a large number of unquestioned legacies are to be paid out of the same net proceeds. The direction to sell is absolute, and independent of the distribution of the proceeds.

There is no doubt, therefore, that these two bequests are mere legacies ; literally, bequests of personal property. (See *Cruse* v. *Barley*, 3 P. Will. 20, 22, and the note of Mr. Cox ; *Amphlett* v. *Parke*, 2 Russ. & Mylne, 221 ; *Gott* v. *Cook*, 7 Paige's R. 534.)

As legacies, the statute relative to *uses and trusts* has no ap-

plication. I will, therefore, on this ground decide against the first objection to these gifts; not hesitating to say, however, that if their validity depended on the application of the statute, I should hold that it did not extend to them.(a)

SECOND. It is objected that the absolute ownership of the moneys bequeathed is suspended in perpetuity, and beyond the period limited by the revised statutes. If this objection be well taken, it is equally applicable to every gift or bequest to a corporation of any kind, which has a perpetual charter. And it is as fatal to several other legacies given by this will, which are not drawn into question, as it is to the two for the poor of Flushing and the Orthodox Friends.

The legal restrictions against *perpetuities* were never directed against gifts for charitable uses, or even for any eleemosynary purposes. From the nature of such gifts, while the good of mankind is to be subserved, they are often designed to continue to the end of time. The longer they are to endure, the

---

(a) There have been some interesting decisions on this subject, in the Supreme Court of North Carolina.

In *The State* v. *McGowen*, 2 North Car. Rep. (Iredell's Equity,) 9, it was decided that a devise of property " for the establishment of a school or schools for the benefit of the poor of the county of Duplin," was a valid devise, and was not such a perpetuity as is prohibited by the constitution of North Carolina or by the common law.

In *The State* v. *Gerard*, 2 ibid. 210, there was a devise of lands to the poor of the county of Beaufort, on the express condition, that the lands were never to be sold, or to be let for over seven years at a time, and that they were to be rented or cultivated as the wardens of the poor should deem most advisable. The court held that the legal title did not vest in the wardens; that it was a devise to such a charitable purpose as was allowed by law before their statute concerning charities; and was sufficiently definite to authorize equity to enforce it; and that the perpetuities forbidden by their constitution are estates settled for private uses, and do not include public charities.

In *Holland* v. *Peck*, 2 ibid. 255, the executors were to pay over and deliver the proceeds of bank stock " for the benefit of the Methodist Episcopal Church in America whereof F. Asbury is the presiding bishop, to be disposed of by conference or the different members composing the same, as they shall judge will be most expedient for the increase and prosperity of the gospel." It was held that the bequest was void, because it was made to a multitude of unincorporated persons in their aggregate capacity, and the object of the bequest was of so indefinite a nature that the court could not determine how it should be applied.

better for the public interests. It is the policy of the law to encourage, not to restrict their extent and duration.

But perpetuities for the aggrandizement of remote posterity, while the immediate and more just objects of the care of the donor are left in poverty and want, are abhorrent to the law, and equally at war with justice and with public policy.

If Peter Thelusson had given his millions for the benefit of the destitute, in a charity like that of Stephen Girard, we never should have heard of the *Thelusson act* against perpetuities.

It is well settled in England, that real property, devised to trustees of charities, is not inalienable; and therefore the objection raised to these gifts on that ground would hardly be tenable, if they were to be regarded as land instead of money. Thus, in *Attorney General* v. *Hungerford et al.* 2 Clark & Fin. 357, 374, a lease of a charity estate made by the trustees, with perpetual renewals, was upheld; and it was decided that the question is one of provident or improvident management. Lord Brougham, Chancellor, said that there is no principle which absolutely prevents alienations by trustees of charities; and that there may be cases in which the trustees could not do their duty to the charity, if they did not alienate a part of the land.

Sir Thomas Plumer, Master of the Rolls, held the same in the *Attorney General* v. *Warren*, 2 Swanst. 291, 302. And see *Attorney General* v. *Cross*, 3 Merivale, 524, 530; Shelford on Mortmain and Charitable Uses, 688, &c.

In the case of the *Dutch Church* v. *Mott*, 7 Paige, 77, before cited, the Chancellor says that our religious corporations have an unlimited power to alien lands, subject to the previous approbation of the Court of Chancery, pursuant to the statute.

And this provision apparently differs from the English rule only in this, that there the courts must see cause to approve the alienation when the question comes before them, unless lapse of time shields the purchaser from that inquiry.

In *Griffin* v. *Graham*, 1 Hawk's R. 96, in the Supreme Court of North Carolina, in equity, the testator devised all his estate to his executors and trustees, in trust to found and maintain a free school out of the issues and profits. He desired that his

real estate should not be sold but rented; and declared, to prevent misconception, that the amount of his real and personal estate, was to be considered as a principal sum and remain undiminished forever. It was held, among other things which I will notice elsewhere, that the will did not create a perpetuity, for the trustees have the power of alienation ; that the notice which might affect purchasers in equity is a circumstance collateral to the power of selling, and will not affect the question of perpetuity. That the clauses in the bill of rights and constitution, were designed only to prevent dangerous accumulations of individual wealth, and referred to estates tail alone. And that the establishment of a *permanent fund for charitable uses*, does not come within the mischief, and is not prohibited by either of those clauses, or by the common law. Ch. J. Taylor says, " assuredly property applied to these ends never entered into the common law notion of perpetuity ;" otherwise the objection would have been taken in the many cases of similar dispositions which are found in the books.

It appears that the North Carolina bill of rights declared that perpetuities and monopolies are contrary to the genius of a free state and ought not to be allowed. And section 43d of the constitution, declared that the legislature of the state should regulate entails in such a manner as to prevent perpetuities.

But to resume the consideration of these gifts as personal estate.

Our statute against the suspension of the absolute ownership of personal property, (1 R. S. 773, § 1,) was avowedly founded on the Thelusson act, 39, 40 Geo. III. ch. 98—as may be seen by the reports of the revisers on bringing it before the legislature. See revisers' notes, 3 R. S. 2d ed. 612; also p. 572. They say that " the English act relates to personal as well as real estates, and the same mischiefs are to be apprehended in each case. The spirit of our institutions is hostile to such investments."

This, and the subject matter, private and personal accumulations, suffice to show that a gift to a charity was not within the intent of the statute or its spirit. It is therefore not within the enactment. It would be absurd to say that a bequest for the use of the poor of the town, or for the maintenance of poor ministers

of the Gospel, should not continue beyond two specified lives in being, *because* their continuance would be mischievous or hostile to the spirit of our institutions; or to assert that because the postponement of the use and enjoyment, and the accumulation of a private fortune, for 80 years, as was attempted by the will of Thelusson, is an enormous evil, therefore those poor people, or equally destitute ministers, of the next generation, ought not to be permitted to taste of the bounty of Friend Nathaniel Smith.

It is not to be denied that the letter of the statute reaches these bequests. The re-investing of the money from time to time, makes no change of the ownership. (See *Hawley* v. *James*, 5 Paige's R. 445, per Walworth, Chancellor.)

But the object of the statute, being to prevent posthumous accumulations of large fortunes and the pampering of a spurious aristocracy, is in truth promoted by charitable gifts, which will diffuse the benefits of an estate in small amounts among the lowly and indigent.

I am satisfied that this objection to the legacies in question is not well founded.

THIRD. The bequest for the benefit of the orthodox ministers of the Friends, it is said, is void, because it does not appoint the trustees who are to hold the fund. And it is farther urged that the trustees under the will, cannot be clothed with the power of designating such trustees of the fund.

This is not a power to create a trust, but at most it is a power to name the first trustees to administer a trust created by the testator. I do not see that it is objectionable. And if it were, the trust would remain, and the court would designate the trustees.

In *Potter* v. *Chapin*, 6 Paige's R. 639, there was a donation of a school house for the benefit of a village. It was given to no one by name, nor for any particular children or inhabitants. Yet it was held a gift for a public charity, which this court would sustain. And on the school becoming incorporated, the estate vested in the corporation. And see *Moggridge* v. *Thackwell*, 7 Ves. 36; *Wellbeloved* v. *Jones*, 7 S. & S. 40.

In the school house case, if there had been no subsequent incorporation and no mode of succession established, the Chan-

cellor would have established one, so that the trust should not fail.

So in *Moore's Heirs* v. *Moore's Devisees and Executors*, 4 Dana's R. 354, 357, the Court of Appeals in Kentucky held that where a charity was given, and no trustee appointed by the will, a court of equity will act as trustee and appoint one if necessary.

I should mention that in the same case the court overruled the objection that the trust was void by reason of its locking up the money in perpetuity.

The bequest to the poor of Flushing is made to the trustees of the will, and is not obnoxious to the third objection.

FOURTH. It is urged against both bequests that the trusts are too vague and uncertain, and the objects too indefinite to enable the court to sustain the trust.

The cases referred to in support of the objection were those where no object whatever was designated ; as a bequest for such objects of benevolence and liberality, as the trustee might approve in his own discretion.

Here the designation is specific. One is for ministers of the New York Meeting of Friends called Orthodox, who are in limited and straitened circumstances, especially those who travel to the yearly meeting. The association of Friends, thus spoken of, is well known and of long standing. There is no difficulty in its identity. Nor is there any doubt as to the meaning of limited and straitened circumstances.

The other is still more specific. It is for the relief of indigent residents of a town. In both cases the power of selecting is necessarily conferred : but that renders the gift no more indefinite. If it were to all the poor or indigent, the trustees would have to exercise a similar discretion.

In the case of *Griffin* v. *Graham*, before cited, the court held that the trust was for a definite charity, and a specific object pointed out, and the court would take cognizance of the case by virtue of its ordinary jurisdiction as a court of equity. There the trustees were to buy two acres in Newbern, build thereon a school house, employ a school master, and educate therein as many orphan children or children of poor and indigent parents,

whom they deemed best entitled, as the funds were found equal to. They were also to clothe and maintain the children, and to bind them out to suitable occupations, when they arrived at the age of fourteen. And see *King* v. *Woodhull*, 3 Edw. Ch. R. 79, 85; *Wright* v. *Trustees of Methodist Church*, 1 Hoff. Ch. R. 202, 239.

In the *Mayor &c. of Philadelphia* v. *Will's Executors*, 3 Rawle's R. 170, the devise of both real and personal estate was to found a hospital for the relief of the indigent blind and lame. And in *Martin* v. *McCord*, 5 Watts, 494, the gift was of land on which to build a school house for the benefit of the neighborhood.

In the *Sailor's Snug Harbor Case*, 3 Peters, 99, the noble charity of Capt. Randall; the devise was made to maintain aged, decrepit and worn out sailors.

In *Moore's Heirs* v. *Moore's Devisees, &c.* 4 Dana's R. 354, the devise was for educating poor orphans of Harrison county, to be selected by the county court. And the court say in that case, that it is not an objection to a devise or legacy, that it is for the benefit of a class of private individuals, if they are described collectively by some characteristic trait by which they may be identified.

In *Bartlet* v. *King*, 12 Mass. 537, the bequest was to trustees, for the persons constituting the American Board of Commissioners for Foreign Missions, for the purposes of the board and to promote the pious objects thereof. It was held valid, although the objection was made that it was void for uncertainty, the board being a voluntary association, and the persons for whose benefit it was intended, incapable of being known or ascertained.

The books are full of similar cases.

Mr. Shelford says almost all the charities which are to be administered in the Court of Chancery have one of four objects in view.

1. Relief of the poor in various ways. 2. The advancement of learning. 3. The advancement of religion. 4. The advance of objects of general public utility. (Shelf. on Mort. and Char. Uses, 61.)

He gives numerous examples of all these, and of many under the 1st and 3d heads, which are decisive against the objection made here for vagueness and uncertainty. (Ibid. 60, &c., 71, &c., 104, 105.)

Among his examples are, "for the relief of the poor of a parish;" and for the poor in various shapes and forms; and numerous gifts for the support of preaching ministers, and for the support of poor dissenting ministers.

And see the celebrated case of Lady Hewley's charity ; *The Attorney General* v. *Shore*, 7 Simons, 290, note ; 11 Simons, 592 ; and 9 Cl. & Fin. 355 ; where the trusts were far more indefinite than these.

FIFTH. As to the objection that the trustees of the town of Flushing are not competent to hold real estate. The answer is, that the bequest is not of land, nor is it made to those trustees. They are only to select the indigent residents of their town, who shall receive the annual bounty provided for them by the testator. There is nothing illegal or questionable in this.

If the bequest were directly to the trustees of the town, the case of *Coggeshall &c. Trustees of New Rochelle* v. *Pelton*, 7 J. C. R. 292, seems to be decisive of its validity.

There must be a decree declaring the trusts of the will accordingly. The parties who appeared at the hearing are entitled to their costs out of the fund.

Decree accordingly.