[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 576 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 577 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 578 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 579 
If the statute of 1859 can be sustained as an exercise of the legislative power of local taxation, several of the suggestions, which it would otherwise be necessary to consider, will be inapplicable. When the State, or a local division of it, acting under a law of the State, seizes and sells land for the non-payment of taxes, or of public charges in the nature of taxes imposed on such land, the proceeding *Page 580 
is administrative and not judicial. The legislature may or may not make use of judicial forms or judicial tribunals, as shall seem most convenient, or most conducive to the object in view, and most advantageous to the State and to the tax-payers. The general laws for the assessment and levying of State and county taxes, and the special statutes under which assessments are laid and collected in cities and villages, are examples of this kind of legislation. No judgment of a court is ordinarily required from the commencement to the conclusion of the process, and if a judicial agency for some part of the proceeding is provided in particular cases, as in the confirmation of the report of commissioners of estimate and assessment in the city of New York, it is not because the matter is judicial in its nature, or because such a mode of determining questions is, in such cases, required by any provision of the Constitution, but merely from considerations of convenience and general propriety. This principle is not disputed by the counsel for the purchasers in this case, so far as the imposing of the burthens which were sought to be enforced by those sales are concerned. It is not questioned but that the assessments were legally laid upon the several portions of the farm devised by the will of John Baker. By the general law the mode of enforcing payment of such assessments was, by exposing the several portions separately charged to a sale for the shortest term of years for which any one would take them and pay the assessment and the charges. It would have been equally within the power of the legislature to have provided that the whole or a portion of the premises charged should have been sold in fee simple, as is done in respect to State, town and county taxes; and whether one or the other mode should be resorted to, was simply a question of legislative discretion. By an act passed in 1855 (ch. 327), it was provided that where there were present and future estates in the same land, vested or contingent, so that the distribution of a burthen charged upon it by tax or assessment among the different owners would raise questions of difficulty, any party in interest was entitled to apply to the court by action to be commenced against the other owners, *Page 581 
who were to be brought in by process or advertisement, and the court was authorized to give judgment for a sale in fee simple of the whole or such part of the land charged as should be required to pay the tax, and an order was to be made for a just and equitable apportionment of the burthen among the several owners, and for the application of the proceeds of the sale accordingly. This was, no doubt, an expedient enactment, but it was not required by any constitutional principle. The legislature might have directed the land to be sold in fee, or for a term, and have left the question open to adjustment between the parties by ordinary action between themselves.
The act of 1859 (ch. 392) was a law of the same general nature. It seems to assume that there was some reason of justice, or convenience, for taking assessments laid upon the parcel of land devised by John Baker, out of the general provisions of law for enforcing assessments for public improvements. As to a part if not the whole of it, there was a present and one or more future estates, which assimilated the case to those provided for by the act of 1855. But the act of 1859, now in question, is special and limited in its operation, being confined to the forty-five acres of land devised by Baker, and affects only the persons interested in that land. It is rarely judicious to direct acts of legislation to the case of a limited number of persons, or to a separate parcel of property. It is ordinarily, if not always, better to leave every person to the operation of the general laws of the State; and where these are found to operate unequally there are usually principles of the common law which will enable the parties to adjust the rights and equities which exist between themselves. The act of 1859 is also peculiar in applying the new method of enforcing payment, to assessments which had been laid and confirmed prior to the passage of the act, as well as to future assessments. Two questions then arise: first, whether the act is invalid on account of its restricted character in respect to the persons and property to be affected; and second, whether it is invalid on account of the circumstance that it is made applicable to existing assessments, *Page 582 
and provides a method for the enforcement, different from that which was provided by law when the assessments were made.
First. A few years ago a case arose in the second judicial district respecting the validity of a local assessment. By an ordinance of the city of Brooklyn, passed in conformity with the charter of that city, the expense of constructing a sewer for the particular benefit of the owners of property upon certain streets, was directed to be assessed upon a specified district embracing the lots fronting on those streets. The proceedings of the city council were removed into the Supreme Court bycertiorari, where they were reversed and set aside by the General Term in that district, on the ground that the legislature had no authority to provide for the imposing of such a burthen upon a locality other than one of the local divisions of the State. The principle was laid down in the opinion of the court in this language: "Legitimate taxation is limited to the imposing of burthens, or charges, for a public purpose, equally upon the persons or property within a district known or recognized by law as possessing a local sovereignty for certain purposes, as a State, county, town, village, c.;" and the court conceded that the rule would exclude from the operation of the taxing power all those cases in which the expenses of laying out public squares, of opening or widening streets, or of other like improvements, are charged upon certain persons or property in consequence of supposed benefits. (The People v. The Mayor, c., ofBrooklyn, 6 Barb., 209, An. 1849.) Shortly afterwards a case arising in the same city, involving the same principle and decided in the same way by the Supreme Court, was heard in this court upon appeal. The whole doctrine of assessments for local improvements was elaborately considered in a very interesting opinion prepared by Judge RUGGLES, in which the views of the Supreme Court on the first mentioned case were carefully examined, and this court, with the concurrence of all the judges, reversed the judgment appealed from. It was held that raising money for a local improvement was an exercise of the taxing power inherent in *Page 583 
the legislature, and that this power of taxation implied a power to apportion the tax (territorially), as the legislature should see fit, and moreover that this power of apportionment had no limit where there was no constitutional restraint, and that the constitutional inhibition against depriving a person of life, liberty or property without due process of law, and forbidding private property from being taken for public use without just compensation, had no application to the case. The principle might be further illustrated by reference to legislative precedents and adjudged cases, but the opinion of Judge RUGGLES furnishes all which it seems necessary to be said upon the question. It follows, from what has been observed, that it would have been legally competent for the legislature to have formed the parcel of land devised by Baker into a separate district for the purpose of administration respecting assessments for public improvements, and to have subjected it to a system of local legislation different from that which prevailed in other portions of the city. It is true that the reasons which influenced the legislature in the cases like those arising in Brooklyn, namely, the compelling the persons and property locally benefitted to defray the expenses of the improvements, were different from those which one may suppose to have prevailed in enacting the statute of 1859. The condition of the title to the property was, doubtless, in the latter case the motive for subjecting it to an exceptional system. But the power of the legislature being established, they are the sole judges of the motives upon which they shall proceed, and their will must stand for the reason of their act. I have not laid any stress upon the circumstance, that all the parties having an apparent interest were notified, and actually appeared, in the proceedings which followed the presentation of the petition of the school corporation. The case not being in its nature within any of the general laws which regulate judicial processes, it was sufficient if the parties promoting the proceedings conformed to the special prescriptions of the statute, and this appears to have been done. And it was not essential to the constitutional legality of the statute that it should have authorized *Page 584 
a jury trial, or in any other way have conformed to the rules which relate to judicial controversies between citizen and citizen. In executing the taxing power, the legislature provides such agencies and safeguards against surprise, mistake or injustice as is thought expedient. It is manifestly proper that the tax-payers should have notice of the imposition proposed to be laid upon them, and an opportunity for making suggestions and explanations to the proper administrative board or officer; and this is generally secured in all well considered systems of taxation. But it is for the legislature to determine and prescribe in every case what shall be sufficient, and there is not, that I am aware of, any constitutional provision bearing on the subject. It has been made a question whether the act under consideration authorizes a sale in fee simple. It provides for a sale and conveyance in general terms without any allusion to a lesser estate than one in fee. The assessments which were to be satisfied bound the land as such, and all estates and interests which every person had in it, and there is nothing in the act to suggest the idea that a partial interest was to be the subject of the sale.
Second. As to the assessments already established, and where nothing remained but to enforce the payment of such assessments, the statute took up the matter in medio, and changed the system under which the collection was to be made. The obligation to pay the amounts had been created, and the land had been charged according to the pre-existing law. I do not perceive any constitutional objection to the change which was made. The act of 1855, the constitutionality of which has been established, presented the same feature. The proceeding was subjected to the new system even where it had gone so far as a sale of the premises for a term of years. A sale of a part under the judgment of a court was authorized for the purpose of raising money to effect a redemption, or to pay the tax if a sale had not taken place. This act of 1855 had been held constitutional by an express judgment of this court. (Jackson v. Babcock,16 N.Y., 246.) It does not distinctly appear whether the assessment in question, in that case, had been laid before the passage *Page 585 
of the act, but from a comparison of the dates I think it must have been so. But, however this may have been, the power of the legislature to regulate and change the forms of procedure in all cases, where no vested rights have been acquired under the existing law, cannot be questioned. (Stocking v. Hunt, 3 Denio, 274; Gould v. Morse, 1 Kern., 281.) Many of the amendments of the Code of Procedure, as is well known, were made to take effect upon existing suits.
There is a point made in the affidavits of the purchasers, and repeated in the brief of their counsel, that some of the lots were sold under the proceedings had before the Special Term, after sufficient had been raised by the prior sales to pay all the valid assessments existing against the land when the order for the sale was made, and when the sale took place. I think it was not the intention of the act to provide by sales of parts of the land for a fund to pay indefinite future assessments when they should be made. The Supreme Court, it is true, is authorized to order sales of any such portions of the lands "as shall be necessary to pay any assessment or assessments imposed, or to be imposed, upon the said land." (Sec. 1.) This expression, I think, was used to show that the remedy was to be a continuous one, and to apply to cases of future assessments when they should be made, and not to confer an authority to sell in advance of such assessments and such sales, to satisfy prospective charges of that nature, which would scarcely fall within any just idea of exercising the power of taxation; and if not, it would be difficult to defend such a provision from the charge of violating the constitutional injunction which secures private property from legislative confiscation. But assuming the construction of the act to be such as I have supposed, I do not perceive that too many lots have been sold. The amount of unpaid assessments, as ascertained by the referee's report, and determined by the order, was $26,600.52; but of this amount $18,533.12 were challenged as illegal assessments, and it was said that suits were pending to set them aside. The court fixed upon a definite parcel, distinctly described, as necessary and proper to be sold, and this parcel was to be and was in fact divided *Page 586 
into convenient lots by the referee, who was charged with the duty of selling, and he sold so many lots as brought $18,790. This was less than the aggregate amount of the unpaid assessments as ascertained by the order, but more than the sum of those which were undisputed. It was competent for the court to order a sale to the amount of the unpaid assessments, though questions might be made as to some of them, and the sales which were actually made, would have been valid, upon the facts appearing upon the papers, prior to the motion of the purchasers. Upon that motion it was shown on their part, that the disputed assessments had been adjudged void by a competent court, before the sale took place, but the corporation showed upon its part, that the progress of municipal improvement had not ceased while these proceedings were progressing; but on the contrary, between the report of the first referee and the sale, additional assessments to the amount of $72,260.64 were laid upon different parts of the premises; and that after the sale and before the hearing of the motion to be relieved, several other large amounts were assessed, so that at the last mentioned period the premises, or parts of them, were legally chargeable with the large sum of $22,374, exclusive of interest. But it may be said that the lots should not have been sold to pay assessments, which were not in existence when the proceeding was commenced, or at least at the date of the report, on which the order for sale was made. The answer given to this is, that the order of sale provided, in terms, that the referee appointed to make the sale should apply the purchase-money in the first place to the satisfaction of all valid liens upon the property sold, which was directed for the purpose of giving to the purchasers an unencumbered title; and then the residue of the purchase-money was to be applied to the satisfaction of valid assessments existing at the time of the report of the first referee, so that the actual produce of the sales was not the nominal amount at which the lots were struck off to the purchasers, but the surplus after deducting the amount paid to extinguish the intervening liens. In the statement made on behalf of the purchasers, to show the sum which, under *Page 587 
the order of sale was to be raised, the damages assessed in favor of the governor as trustee was deducted, as it ought to have been if it had been paid; but it was shown on the other side that the city comptroller had refused to pay it over. Hence, the amount to be raised by the sales was not reduced by that circumstance. If it shall be eventually paid pursuant to the direction of the order, it is evident that there will be sufficient employment for it in the payment of subsequent assessments. I conclude, therefore, that it has not been shown that any lots were sold after the power to sell had been exhausted.
The result of these views is, that the sale in question was made pursuant to a valid act of the legislature passed in the execution of the power of local taxation.
I have assumed hitherto, that there was some interest in the Baker farm belonging to parties who were not required by the act of 1859 to participate, and who did not in fact participate in the legal proceedings which were had in the Supreme Court, and who could not, therefore, be affected by those proceedings. The act itself exempts from the effect of the sale the interest of any lessee, (other of course than the petitioners), and also of the heirs of Baker. The latter, if they exist, could have no estate, provided the devise to the governor of the ultimate remainder, was valid. On the supposition that it was not valid, they would be seized of a vested interest in reversion, and the question would be, whether the absence of heirs of Baker was so conclusively shown that the land would be forced upon the purchasers by the Court of Equity. Baker died sixty-seven years ago in the city of New York, leaving no descendants, and without any known collateral relatives in this country. One of the witnesses examined before the referee understood that he had a brother, one Sir Charles Baker, in England. The petition contains the following statements on the point: "that no person has at any time, or in any way set up, or asserted, any claim to said premises as an heir-at-law of said John Baker, to the information or belief of your petitioners, that as they are informed, and believe, he left no descendants now *Page 588 
surviving, and that his collateral relations and their descendants, were alien subjects of the king of Great Britain, and incapable of taking said premises by inheritance, and that your petitioners have no notice or information of any kind, or degree, that there is any person whatever claiming to be, or reported to be, an heir or relative of John Baker." And the referee reports that he finds all material statements in the petition to be true. But as by the act the rights of the heirs, if there were any, were expressly saved, there is nothing in the nature of an estoppel by judgment in these procedings, to affect them if they should hereafter appear. It is to be observed also that the estate in reversion has not yet taken effect in possession, the life estates not having yet terminated, and that by possibility the persons entitled as heirs may be awaiting the extinction of those estates to enter upon their inheritance. Still if there had been any collateral heirs who were residents of or residents in this country, according to all common experience their existence would have been known in the city of New York. Although not yet entitled to the enjoyment of the estate, by reason of the prior limitation, they would as reversioners have been interested in its management, and in any transaction respecting the title, and it is scarcely conceivable that some one of the numerous persons to whom interests in the property were given by the will of Baker, would not have been made aware of their existence. It is more easy to suppose that there may be descendants of collateral relatives extant in England, but being aliens to this country, they would be incapable of inheriting. Upon this branch of the case my conclusion, formed with some hesitation I admit, is, that the existence of heirs is so improbable that it is not to be considered as prejudicing the title. The purchasers have all the title which the State can confer, and if the land has escheated for defect of heirs of Baker, or their alienage, those purchasers will by force of the act of 1806, hold under the title by escheat. Supposing the devise of the final remainder to have been void, it was still a devise in terms for the use and benefit of the Protestant Episcopal Charity School, and was therefore *Page 589 
embraced within the provisions of the seventh section of the act, which authorizes the corporation to take and hold all estates so devised. The act would at least furnish a good title as against the State.
But I am of the opinion that the devise to the governor for the time being, in trust to take and receive the rents and profits of the land, and apply them to the education and support of the charity scholars of this school, was a valid charitable devise. The school it is true, was not incorporated, but it was a distinct and well known institution, and there was a competent trustee authorized to take when the remainder should vest in possession. The case of Williams v. Williams (4 Seld., 525), determined that the law of charitable uses, as it existed in England at the time of the revolution, and the jurisdiction of the Court of Chancery over the subject, became the law of this State upon the adoption of the Constitution of 1777. In that case, as in this, the direct disposition was to a trustee competent to take an estate devised upon valid trusts, though that was not considered material by the judge by whom the opinion was prepared. Subsequent cases in this court have perhaps limited the application of the doctrine to devises which presented that feature, namely, the existence of a competent trustee. (Owens
v. The Missionary Society, 14 N.Y., 380; Downing v.Marshall, 366, 382.) But that qualification is not material here. The present, therefore, is a valid charitable gift, upon all the cases.
Before considering the effect of the act of 1806, it may be useful to determine the legal character of the last remainder limited by the will, assuming it to be valid, upon the question, whether it was vested in interest or contingent. The general if not the universal rule is, that where there is a person in being in whom the estate in remainder would vest in possession if the precedent estate should immediately terminate, it is vested in interest, though it may not be certain that such person will be living or qualified to take at the actual cessation of the prior estate. (Fearne on Rem., p. 215; Lawrence v. Bayard, 7 Paige, 70; 1 R.S., 724; Sec. 13.) Tested by *Page 590 
that rule, the remainder expectant upon the expiration of the life estate would vest in the governor who was in office at the death of John Baker. But we know with certainty that this would be contrary to the intention of the testator, for the language of the will is, that he gives and devises the land "from and immediately after the determination of the said several estates for life by the death of the several devisees for life, unto the governor of the said State of New York for the time being."
This is equivalent to saying that the governor, who shall be in office at the death of the last tenant for life, shall take the land as devisee in trust for the charity. There is no succession in the line of the governors of the State of property devised to them by private parties for extra-official purposes, such as exists between heir and ancestor, or in the officers of corporations, and, therefore, the remainder would not descend from governor to governor, as changes should happen in the incumbency of that office. The land is given to the governor who was intended to take, in fee simple, and hence the legal estate would descend to the heirs, or pass to the devisees, of the governor who should first die seized of the remainder. But it was certainly very remote from the intention of the testator that at the falling in of the life estate, the charitable devisees should be obliged to look up the representatives of the governor who was in office at some period during a former generation. My opinion, upon considerable examination and reflection, is, that the remainder vested in interest in fee simple, in the governor who was in office at the death of the testator, subject to be defeated by the fact of the incumbency of a different person at the time of the termination of the life estate. This last limitation would be a valid executory devise, and would not be void for remoteness, for it must take effect at the termination of specified lives in being. It is of the essence of such conditional limitations that they are not capable of being defeated by any act of the person seized of the precedent estate in fee. Such a construction of the limitations of the will as I have suggested, would be consistent with the intention of the testator, that the governor in office at the death of the last *Page 591 
tenant for life, would be the person to take the absolute estate in fee, for the purposes of the trust, and would not violate the rule just referred to, requiring a remainder to vest at the commencement of the estate for life, if there is then a person in existence competent to take, if the estates for life should immediately terminate. The point is material only to show that the approval of the act of 1806 by the governor then in office, Morgan Lewis, could not be made use of to defeat the estate of the governor who shall fill the office at the expiration of the life estate. If that had happened during his official term the act of approving the law would probably have estopped him, but it can have no effect upon the executory limitation. I forbear to enlarge upon this view, or to refer to authorities in its support, because in my view the act can be supported upon the principles to be immediately stated.
The act of 1806, if liable to no constitutional objection, had the force of a law, and divested the estate of the trustee referred to in the will in favor of the school corporation, who thereupon became seized of the estate for the purpose of the charity. It has been decided in this court that the legislature has no constitutional power to cause land to be sold for the purpose of disentangling an estate, where the parties entitled to future estates are under no disability and are competent to act for themselves, though it is fully admitted that it may be done where the rights of infants, lunatics, c., are concerned (Nowers v. Biegen, 3 Seld., 358), and by a series of cases in this court and the late court for the correction of errors, as well as in the courts of original jurisdiction, it is firmly established that the legislature has full power to order sales of the estates of infants for the purpose of unfettering the title for the support of the infants, or for any reasons connected with their interests and welfare. (Clark v. Van Sorlay, 15 Wend., 436; S.C., in error, 20 id., 365; Towle v. Forney,14 N.Y., 423; Williamson v. Moore, Court of Appeals, March Term, 1862.) A great number of statutes have been passed for these purposes during almost the whole existence of the State government, *Page 592 
and which may be readily found without citation here. In the second and in the last of these cases the authority to pass such laws is deduced from the sovereign power, which is vested in the government, to superintend the interests, and provide for the welfare of infant children and lunatics, and which, under the system prevailing in England, is vested in the king, who is said in such cases to act as parens patriae, and which the Court of Chancery usually exercises by delegation from the sovereign. Now, by referring to the English books, it will appear that the same power which is vested in the crown, touching parties under the disability of infancy and lunacy, embraces the case of property given for the purposes of charity, and it is vested in the sovereign in the same paternal character. (Shelf. on Mortmain, pp. 267, 268, 399, 691, note d.) And there are several adjudications in the courts of this State to the same effect. In the case of The Elder, c., of the First Baptist Church inHartford v. Witherall (3 Paige, 296) real estate had been granted by private individuals to the plaintiffs under the name by which they had associated as an unincorporated religious society. By the act for the incorporation of religious societies it was provided, in language very similar to the act of 1806 under consideration, that a church, when incorporated under that act, should be authorized to take into its possession all the property of the society, whether the same was given directly to such church or society, or to any other person for their use, and to hold such property as fully and amply as if the right or title thereto had been originally vested in the trustees of the corporation. The First Baptist Church in Hartford afterwards became incorporated under the act, and the court held that the title to the property vested in the corporation by force of the act. A similar decision was made in The Dutch Church v. Mott
(7 Paige, 81, 82), and in Inglis v. The Sailors' Snug Harbor
a devise was held valid which provided for vesting the property in a corporation to be thereafter created. (3 Pet., 114.)
If I am right in these last positions, the act of 1806 was a valid exercise of legislative authority, and operated according *Page 593 
to the intent to extinguish the title of the governor in office, and of all future governors, and to vest the remainder in the school corporation. That corporation having subsequently become the grantee of the surviving devisees for life in the whole of the Baker farm, except the ten acres leased to Hogg, it was seized of an absolute fee simple of the lots sold under this proceeding, and the purchasers will, upon the execution of the conveyances, acquire a perfect title to their lots.
I have purposely omitted until now, to consider one of the points insisted on by the counsel for the purchasers. It is argued that the devise was not for the benefit of the school mentioned in the will, but of the individual charity scholars, and hence, that it is not within the scope of the act of 1806, which speaks of property which may have been devised for the use or benefit of the Protestant Episcopal Charity School. The children were not to take any benefit except as belonging to the charity school; considered independently of the school, no poor children had any connection with the gift. The general intendment of such a disposition of property is, that the care and instruction mentioned is to be dispensed by the institution to whom the scholars are confided, and where clothing and maintenance are to be furnished, they would naturally, if not necessarily, come through the same channel. According to the common understanding, a gift to the children belonging to an existing school, of such benefits as the school was accustomed to furnish, would be a gift to the school. The scholars are a fluctuating class of persons who would be incapable of taking such benefits, except through some medium competent to supply them. This would be my judgment of the natural effect of the will if there was no authority for the doctrine. But the precise case has arisen in the English Court of Chancery. In The AttorneyGeneral v. Tancred (Amb., 351), it appeared that a testator had devised land to trustees to pay the profits to twelve students to be educated at Christ's College, Caius College and Lincoln's Inn. The devise being a charity was void by the mortmain act, 9th Geo. 2d, chap. 36, except as *Page 594 
the universities and their colleges which were especially excepted in the fourth section of the act. The Lord Keeper said: "The heir-at-law insists that the devises are void as to the eight studentships, because they are not given in terminis for the benefit of the colleges, and therefore not within the word or meaning of the exception in the statute. But I am of opinion that such dispositions are for the benefit and advantage of the colleges and within the meaning of the exception." A more pointed decision of the question could scarcely be made.
In whatever light I have been able to view the questions, I am of opinion that the purchasers will have a good title. I am, therefore, in favor of reversing the order appealed from, and of requiring the respondents to complete their purchase and of charging them with the costs.
All the judges concurred in the result.
Order reversed, and the respondents required to complete their purchase and to pay costs. *Page 595