McCaughal *v.* Ryan.

———————◆———————

## McCAUGHAL *vs.* RYAN.

Where land escheats to the state, through defect of heirs of the person dying seised, the state may grant the same, without actual entry, or inquisition; even though it be held adversely by one claiming title thereto.

Such a grant will pass the title of the state, to the grantee, and its right to institute and prosecute a suit for the recovery of the land.

A testator, by his will, devised as follows: " Fourth. I give, devise and bequeath all the rest and residue of my personal estate, and all my real estate which I shall own or be possessed of at the time of my death, unto the Right Reverend Bishop Hughes of the city of New York, *in trust* for the use and benefit of the Roman Catholic Church of the state of New York." *Held* that this devise, purporting to create an express trust, of a nature more extensive than what is permitted by the revised statutes, and without containing the power to discriminate, and confine it to the allowable purposes, was null and void.

*Held also,* that the title to the land not having been effectually devised,

McCaughal *v.* Ryan.

and the testator having died without inheritable heirs, it escheated to the people of this state, and passed to the plaintiff by virtue of an act of the legislature, subsequently enacted, releasing and granting the land to him, as escheated property.

The decision of the court of appeals in *Williams* v. *Williams,* (4 *Seld.* 525,) is not to be extended beyond the exemption of donations for pious and charitable uses from the operation of the laws to prevent perpetuities.

Trusts of real estate for *pious* and *charitable uses* are not sanctioned, but on the contrary are absolutely prohibited, by the provisions of the revised statutes relative to uses and trusts.

MOTION by the plaintiff for a new trial, after a judgment for the defendant on a trial before a justice of the court, at the circuit, without a jury. The action was brought for the recovery of real estate. The facts are fully detailed, in the opinion of STRONG, presiding justice, and need not be here repeated.

*M. S. Bidwell,* for the plaintiff.

*T. McKissock,* for the defendant.

S. B. STRONG, P. J. This action was instituted to recover a tract of land in the village of Newburgh, in the county of Orange, of which one George McCaughal died seised in fee in 1842, on the ground that it had escheated to this state through the defect of heirs of McCaughal and the invalidity of an attempted devise of it to Bishop (now Archbishop) Hughes. McCaughal had no descendants; he was an illegitimate child, born in Ireland and naturalized under our laws, and his mother, if she is still living, and all her relations so far as are known, are aliens. He made a will after he had been naturalized, containing the following clause: "Fourth. I give, devise and bequeath all the rest and residue of my personal estate, and all my real estate which I shall own or be possessed of at the time of my death, unto the Right Reverend Bishop Hughes of the city of New York, in trust, for the use and benefit of the Roman Catholic Church of the state of New York, which

said personal and real estate in this last devise and bequest in trust mentioned, is to be paid, transferred and passed over to the said trustee mentioned, by my said executors, in one year after my death." The will was duly proved. Bishop Hughes afterwards executed and delivered to the defendants, for a valuable consideration, two deeds; one dated October 1, 1846, and the other dated May 1, 1850, purporting to convey to him the premises in dispute, in fee. On the 17th of June, 1853, the legislature of the state passed an act releasing and granting to the plaintiff (who is a relative of the putative father of the deceased,) "All the estate, right, title and interest of the people of the state of New York, acquired by escheat, and in and to all the real estate and chattels real situate in the county of Orange, of which George McCaughal, late of the village of Newbnrgh, in said county of Orange, died seised or possessed." The plaintiff claims the land under this legislative grant. The defendant claims it under the will and the subsequent conveyance to him.

The defendant's counsel contended on the argument that, supposing the land to have escheated, the state could not have conveyed it before entry. The objection is founded on the English rule that the king cannot enter upon, or grant, the land until his title is found by inquisition. That was rendered necessary by the statutes of *Westminster 1st, Ch.* 24, and of 18th *Henry 6th, ch.* 6. Previous to the enactments of the first of those statutes, the escheators and sheriffs could seize the lands into the king's hands without office found. The statutes having been repealed in this state, their requisitions are not in force here, and the common law rule must prevail. It is, undoubtedly, competent for the state to take immediate possession of lands which would otherwise be in abeyance through the death of the last tenant in fee without heirs. The revised statutes relative to escheats, (1 *R. S.* 282,) recognize this right, by authorizing an action of ejectment for escheated lands, without any preliminary inquisition. There is no constitutional provision restraining the legislature

from making a grant of land to which the state has a valid title, although the same may not be in the actual possession of any of its officers, or may be held adversely by others. The grant would, of course, be insufficient if it purported to enable the grantee to deprive any one of his property without due process of law; but the statute making the grant in question goes no further than to grant the title of the state and its right to institute and prosecute a suit for the recovery of the land. In neither respect is there any invasion of private rights. In grants between individuals, where no title passes by reason that the lands are held adversely, an action for their recovery may be sustained by the grantor; but a legislative grant unquestionably passes the title of the state to the grantee, and if he cannot maintain an action for its recovery no one else can, and a wrongful claimant in possession might hold it in defiance of a rightful owner.

In this case, if the plaintiff is authorized to prosecute his suit without any merely formal impediment, the defendant is not, and cannot be, deprived of any of his substantial rights. If his title is valid he must prevail.

The exception in the statute in favor of the creditors and purchasers in good faith of the deceased, cannot protect the defendant, if the devise to Bishop Hughes should be deemed invalid; for in that case the defendant would be neither. He may have been, and no doubt was, a purchaser in good faith from the bishop (but certainly not from the deceased) through an ineffectual devise.

The intended devise, in this case, is in trust, and was no doubt designed for pious and charitable uses. There are no words of limitation, nor is the devisee a corporation under our statute providing for the incorporation of religious societies. The devise is to the bishop by his name of office, and although his successors are not named, the word estate, which is used, would probably convey the legal fee. By our toleration of all religious denominations we recognize their ecclesiastical officers, and when property is donated to them by their name

McCaughal *v.* Ryan.

of office it would, I think, descend to their successors; especially if it should be in accordance with their denominational rules, as it would be in the instance under consideration. Unless there is something in the nature of the trust which would suspend the power of alienation—and I think that there is not—the bishop might, if the devise is valid, (as he has done,) sell and convey the land whenever he might deem it expedient to do so, and might also apply the proceeds at his discretion to the indicated purpose, which is broad enough for the immediate absorption of the whole. If he could be restrained in the administration of the trust by a court of equity, still the power of alienation would not be absolutely suspended. Our religious corporations cannot sell any part of their real estate without the permission of the supreme court, and yet it has never been supposed that lands conveyed to them would be inalienable within the meaning of the provisions of our statute to prevent perpetuities.

The great objection urged against the devise in question, is that it purports to create an express trust (and indeed that is its entire object) which is not sanctioned, but is absolutely prohibited by the second article of the title of the revised statutes relative to " the nature and quality of estates in real property and the alienation thereof." It is provided in the first section of that article, being the forty-fifth section of the title, that " uses and trusts except as authorized and modified in such article are abolished." Four classes of purposes for which express trusts may be created are specified in the fifty-fifth section, and no others are authorized. Some others may be saved as powers, but they convey no estate, and they are confessedly inapplicable to the devise now under consideration.

The trusts which that devise contemplated are not pointed out, or at all limited to the purposes designated in and limited by the statute. They are not either to sell the land for the benefit of creditors; or to sell, mortgage or lease it for the benefit of legatees, or for the purpose of satisfying any charge thereon;

McCaughal *v.* Ryan.

or to receive the rents and profits of the land and apply them to the use of any person during the life of such person, or for any shorter term ; or to receive them, or to accumulate the same, for any purpose mentioned in the first article of the same title.   It is quite clear that if the prohibition in the statute is applicable to donations of real estate for pious and charitable purposes, it is fatal to the intended devise to Bishop Hughes.

It is undoubtedly true that gifts for pious and charitable uses generally contemplate a much wider range than that specified in the revised statutes relative to uses and trusts.   Indeed such donations are seldom limited to any of the purposes designated in the statute ; they are not for the benefit of creditors or of any particular legatees, or of any particular person, during the life of such person, or for accumulations for any purpose mentioned in the statute.   That may be a strong reason why the statute should have exempted trusts for the promotion of piety and charity from its operations, or should have directly subjected them to separate regulations.   But notwithstanding this consideration, it seems to me that a statutory prohibition unusual in its terms must be applied as it reads.   There is no dispensing power as to any particular person or subjects in our courts.

If exceptions could be made on the ground of inconvenience, inexpediency, incompatibility, or even injustice, the entire statute might be frittered away.   It is possible, however, that the framers of the statute may have designed to limit the range if not the number of such donations, from an impression that the givers may with the best intentions mistake as to the appropriate means for the prosecution of true piety or the application of defective or discriminating charity, and particularly when the designed appropriations may extend far into futurity, and when there may be many changes in this our ever changing country.   Whatever may have been the reasons, however, the legislature has made no exceptions ; nor do I feel

authorized to make any, except where I am required to do so by a higher power.

It was contended on the argument that our court of appeals had decided, in *Williams* v. *Williams*, (4 *Selden*, 525,) that statutory regulations do not affect donations for pious and charitable uses, unless they are particularly named. As we are bound by that decision, it is proper that it should be fully considered, in order to ascertain its extent, and its applicability to the case now under consideration. In that action a bill had been filed in the court of chancery to procure a judicial declaration of the nullity of two bequests of the late Judge Potter, of Huntington in the county of Suffolk; one, of $6000 principal to accumulate by interest to $10,000, to the trustees of the incorporated Presbyterian Church of that village, to apply half of the interest during process of accumulation, and the entire interest when completed, to the support of the minister of the church; and another of equal amount to accumulate to the same extent to three trustees and their successors, to be applied one half during the accumulation, and the entire interest afterwards, to the education of the children of the poor who should be educated at the academy in the same village. The bill alleged that these legacies were invalid, as they would suspend the absolute ownership of the property for a longer period than during the continuance of two lives in being at the death of the testator; and that the direction for accumulation was void, as such accumulation would not be certainly for minors who should be in being at the death of the testator, or who should be born within the time allowed for the suspension of the absolute ownership of personal property. No objection was raised, and as it was a bequest of personal property, none could be raised as to the illegality of the trusts, from their incompatibility with the character of those sanctioned by the revised statutes; nor was it objected that the direction to pay a fixed sum towards the support of the minister would, if followed, interfere with the authority given to the members of the society by the eighth section of the act

McCaughal *v.* Ryan.

relative to religious incorporations, to fix the salary of their ministers—a power which, according to the opinion of Judge Selden in *Robertson* v. *Bullions*, (1 *Kernan*, 263,) should "forever give to the majority of the congregation the control over the employment of their minister." The court of appeals, in the case of *Williams* v. *Williams*, sustained both of the contested legacies, as to the principal sums. In reference to the legacy to the church, the court assumed the grounds that donations to religious societies were expressly sanctioned by the act providing for their incorporation; that such gift might have been for all time, when that act was passed, and as that act had not been repealed they might still be in perpetuity. Although if it had been a new question it might well be doubted whether the legislature, in authorizing those incorporations to take and hold property, did not design to, and did not in effect, refer to such as might be given and held agreeably to the general laws which might be in existence at the time when they were made, yet we are bound to decide otherwise as to the donation of the estate. I cannot think, however, that the court of appeals would decide that those corporations could take now if they could not have taken when the statute authorizing their construction was passed, a legacy given in an unattested will of personal estate or a devise in a will of real estate which had not been executed with the solemnities required by the revised statutes, or that they are not subject to the provisions of modern date in our statute of frauds and of limitations. In this matter I conceive that we are bound to go just so far as our higher court has gone, and no farther.

Another ground upon which both legacies were sustained is that the provisions of our statutes preventive of perpetuities were inapplicable to donations for pious and charitable uses. It was inferred that such gifts were from their nature perpetual. Such may have been their character heretofore, but it is difficult to see why temporary donations for these purposes might not be made, and it is still more difficult to conjecture why their required existence should not be for a limited period.

Our general policy has been to promote the entire vendibility of property, and to prevent a long and especially a perpetual restriction of its free alienation. If we prevent any one from fettering his property, beyond a brief period for the benefit of children or other descendants who are the first objects of his care and his bounty, why should he be permitted to shackle it forever, in behalf of others? Institutions which may be commendable for piety and charity now, may be, as they often have been, perverted; and no man can be far-seeing enough to provide for the altered circumstances of institutions, or the class of persons for whose benefit they were originally established. Indeed it may well be doubted whether it would be wise to permit any one to control the destination of his property, for any human purpose, beyond a limited and brief period. If a pious or charitable institution should be under the management of discreet and conscientious persons, it would be better to commit the absolute disposal of property intended to aid them in their objects to the managers, who might appropriate it judiciously and conformably to altered circumstances, than to circumscribe its use according to the existing judgment (sometimes wise and frequently capricious) of any man. The power of any one over property, or its destination, extends far enough when it is continued for two consecutive lives beyond his decease. The court of appeals sustains the doctrine of the non-applicability of our statutory restrictions upon the durability of estates to pious and charitable donations, by the rule in England, that they are not there subject to the laws to prevent perpetuities. But the laws to prevent perpetuities in that country are not statutory. These were rules established by judicial legislation, and were considered as part of the common law. The common law is expansive, and might have allowed the exception in favor of religion and charitable donations, if that had been necessary; but it was not, as the statute of Elizabeth sanctioned such donations as it specified (and none others were sustained to the same extent) in perpetuity. Statute law, however, is unyielding; it com-

mands implicit obedience and allows of no·exceptions, certainly none except such as it specifies, or are plainly inferrible from its terms.

I do ·not understand the Court of Appeals as holding, in *Williams* v. *Williams,* that our statutes are wholly inapplicable to donations for charitable or pious uses. Indeed a contrary opinion is clearly inferrible. That case decided that the directions for accumulations, in Judge Potter's will, were defeated by the statute. It is remarked, in the only opinion published, (page 538,) " that what is said respecting accumulation is simply a direction which the testator had no right to give, and which according to the mandate of the statute is to be held void." So, too, the learned judge who expressed that opinion, in speaking of the decision of the court for the correction of errors, in *McCartee* v. *The Orphan Asylum Society,* (9 *Cowen,* 438,) says, (page 550,) " The Orphan Asylum Society was a charitable corporation not authorized to take by devise, and corporations not so authorized, it is well known, were excepted by the statute of wills;" and certainly the court for the correction of errors did decide, in that case of the Orphan Asylum Society, that the exception in the statute of wills was applicable to a corporation for charitable purposes, and rendered an attempted devise to it null and void. The chancellor had attempted to sustain the devise of real estate to the Orphan Asylum Society, on the grounds, first, that it was in effect a devise of the use and not of the legal estate which the statute would avoid ; second, that if the devise was direct to the corporation and the legal estate would therefore descend to the heir, yet he would take it with a trust in favor of the charity, which the law relative to charitable uses had fastened upon it; and third, that the act incorporating that society authorized it to take land by purchase, which technically included a devise, and exempted it from the operation of the exception in the then existing statute of wills. The court reversed the chancellor's decree which sustained the devise, and dismissed the complaint as to

the real estate; thus, as it seems to me, negativing each of the positions so elaborately and certainly very ably advocated by the chancellor. It is much to be doubted whether, after the enactment of the second statute of wills in the reign of Henry the 8th, a devise to any corporation for charitable purposes, except such as was authorized by the statute of Elizabeth, was ever sustained by any court in England. In the case of *Baptist Association* v. *Hart's Executors*, (4 *Wheat.* 1,) Chief Justice Marshall said, " We think we cannot be mistaken when we say that no case was decided between the statute of Henry the 8th, (the statute of wills,) and the statute of Elizabeth, in which a devise to a corporation was held good in equity. Such a decision would have overturned principles uniformly acknowledged in that court. The cases of devises that had been held good were decided since the statute of Elizabeth, on the principle that the latter statute, so far as it relates to charities, repeals the former." So also Mr. Justice Story, in his work on Equity Jurisprudence, (§ 1152,) remarks that " devises to corporations, which are void under the statute of Henry 8th, are made good solely by the statute of Elizabeth; for it is plain that a devise void by statute cannot be made good upon any principle of general law." And Judge Duer, who was one of the revisers of the statutes of this state containing the restrictions upon perpetuities and trusts, and is one of our most distinguished equity lawyers, in quoting this extract from Mr. Justice Story's work, (in *Ayres* v. *Trustees of Meth. Epis. Ch.,*) reported in the *New York Legal Observer*, *vol.* 8, *p.* 17,) characterizes what he said as " a remark which, considering the subject to which it was applied, is equivalent to saying that where the words of a statute are general there is no principle of law that can justify a court of justice in creating an exception that is not created by the statute itself."

The legislature is perhaps the best expositor of its own statutes. In the act of April 15th, 1839, relative to certain trusts, it provided that all deeds of trust to the United Society

McCaughal *v.* Ryan.

.of Shakers, executed and delivered prior to the 1st day of January, 1830, (when the revised statutes took effect,) should be valid and the trusts should be executed in the same manner and to the same effect as before that date; and the act expressly sanctions the subsequent creation of trusts for the use of the members of the society according to its religious constitution.    There are also provisions in an act passed on the 17th of April, 1829, (ch. 184,) in effect exempting deeds of trust to the Society of Friends from the restrictions against perpetuities and trusts contained in the revised statutes.    So, too, in an act passed on the 14th of May, 1848, (ch. 318,) there is a provision that trusts in deeds to incorporated colleges and other literary incorporated institutions, or to corporations of cities and villages, for purposes of education, or to commissioners of common schools, and trustees of school districts, for the benefit of schools, may be carried into effect according to the conditions prescribed by the donors (within certain limitations as to the purposes,) and that they may continue for such time as may be necessary to accomplish the purposes for which they may have been created.    Some of these provisions would have been supererogatory if donations for pious and charitable uses had not been previously subjected to the provisions of the revised statutes forbidding perpetuities, and restricting trusts.

I have not deemed it necessary to review the numerous authorities which are usually cited in cases involving the consideration of this most prolific subject.    I have expressed my sentiments upon some of the reasons assigned for the decision of the case of *Williams* v. *Williams,* which seemed to me to be at variance with principles sanctioned and applied to the same case.    I have felt called upon to express my dissent from such as were opposed to the conclusions which I have adopted in this case.    I have done so with some reluctance, and certainly with entire deference and with the greatest respect for the distinguished jurist whose very learned and able opinion has been reported, and for the judges who concurred with him.

It seems to me that we are not bound to extend the decision of the Court of Appeals beyond the exemption of donations for pious and charitable uses from the laws to prevent perpetuities, and that we are at liberty to decide, as we do, that the devise in this case being for a trust more extensive than what is permitted by our revised statutes, and without containing the power to discriminate and confine it to the allowable purposes, is null and void.

The title to the land in dispute not having been effectually devised, and the last proprietor having died without inheritable heirs, escheated to the people of this state and passed to the plaintiff through the act of the legislature.

The learned judge before whom this action was tried having decided it in favor of the defendants, the judgment must be reversed. There must be a new trial, with costs to abide the event of the suit, unless the parties can agree to substitute a special verdict and a judgment upon it in favor of the plaintiff, for the purpose of having it more readily reviewed.

EMOTT, J. The devise in the will of George McCaughal under which the defendant claims title is expressed in these terms : "I give, devise and bequeath all of my real estate which I shall own or be possessed of at the time of my death unto the Right Reverend Bishop Hughes, of the city of New York, in trust, for the use and benefit of the Roman Catholic Church of the state of New York." I agree with the presiding justice that this devise, if valid, would pass a fee, but I cannot agree that in that event, the fee would vest in the Bishop or Archbishop of New York, and his successors in office, in communion with the Roman see. The words here used would vest the estate in the devisee as an individual, by a certain description, but they are not apt words to convey a title to an officer as such, even if he had capacity to take lands and transmit them in succession. But I am not aware of any such corporate capacity in any ecclesiastical officer, under our institutions. It is true that our government and laws

McCaughal *v.* Ryan.

tolerate the forms and organizations as well as the doctrines, and for certain purposes and to a certain extent, recognize the officers, of all religious denominations or churches. But we do not go so far as to give them a legal existence to take and transmit property in the succession of their offices, without the aid of special enabling statutes, and these, I may add, are very rarely passed. The view which my learned associate takes of this branch of the case, leads him, in effect, to confer upon the person holding this office in a particular church, all the attributes and prerogatives of a sole corporation. It seems to me that neither is such a corporation recognized by the general rules of our law, nor can it be created by the mere mention of an office in a devise or a conveyance. The title "Right Reverend Bishop," which is all that is to be found here, relating to the office of the devisee or its succession, cannot be any thing else than a "*descriptio personæ.*" I suppose it would not be regarded as any thing more even in a country whose laws favored sole corporations, religious and lay. But under our laws, this is merely a devise to John Hughes of the city of New York, who is described as a Bishop, and so appears, although this is not expressly stated in the will, a Bishop of the Roman Catholic Church. If this devise is valid, the devisee took a fee, as I have said. It was not contended that he could take, unless as a trustee, or upon the trusts of the will. If they are void the devise must certainly fail altogether. If these trusts can be sustained, this estate passed to the devisee, and unless the courts possess the power to appoint a trustee in his room, upon his death, resignation or removal, a question to which I shall recur hereafter, this fee would of course pass to his natural heirs, upon his death. Bishop Hughes must take and hold these lands, if the devise is valid, just as any other individual, clerical or lay, to whom they might be devised on similar trusts would have done. Whether in such a case the devisee could convey a title discharged of the trust it is not necessary now to inquire. If the trust be valid, the plaintiff must fail, for then the legal

McCaughal v. Ryan.

and equitable title is elsewhere than in him. If it be invalid, then no estate passed by the devise, and the plaintiff, representing the title of the state through the escheat for want of heirs, as my associate has shown he does, must recover the lands. "The Catholic Church in the state of New York" is not a corporation, any more than its bishop; nor a legal person in whom this title might in any way vest, passing through the trustee. As legally known and recognized it can only be regarded as a particular body of christians professing certain tenets, and adhering to a particular communion. If this devise for the benefit of this religious body be valid, it must be as "a pious use"—a trust which a court of equity can recognize and enforce in the exercise of its jurisdiction over that peculiar class of trusts, from whatever source they may be derived. I do not intend to examine the questions at large whether this would be a good "pious use" under the rules which are applied to such cases in the courts of our mother country, or under any rules which have been recognized in our own country; or what principle can be used by our courts to discriminate among all the uses or purposes which might be so styled by the adherents of the various creeds and religions that exist among us. I will assume that the devise in question is sufficiently expressed as to its terms and its objects, to constitute a trust, and that it is for a purpose which might be permitted in the courts of this country as a "pious use."

Nor do I mean to enter the maze of antiquarian research and abstruse learning which surrounds the question of the origin and extent of the chancery jurisdiction over charitable uses. Nothing indeed could be added to what has been elicited and urged upon this subject, not only in the English cases, but in the courts of this country, in Ch. J. Marshall's well reasoned opinion in *The Baptist Association* v. *Hart's Executors*, (4 *Wheat.* 1;) in Chancellor Jones' very learned discussion of the cases, in *McCartee* v. *The Orphan Asylum Society*, (9 *Cowen*, 437;) in Mr. Binney's masterly argument, and

the judgment of Mr. Justice Story in *Vidal* v. *Gerard's Executors,* (2 *How.* 127,) and in the elaborate opinion of Judge Selden in the recent case of *Owens* v. *The Missionary Society of the Methodist Episcopal Church,* not yet reported.

But the question whether courts of equity possessed an original and inherent jurisdiction over charities and pious uses, or were indebted for all the powers exercised by them in such cases to the statute of 43 Eliz., whatever interest it may possess for the lawyer or the antiquarian, or whatever bearing it might formerly have had upon such devises in this state, is not the practical question in the case before us. Probably that question must be considered as settled in favor of the validity of such trusts, independent of the statute of Elizabeth and of an equitable jurisdiction apart from the statute, to examine and enforce them where their creation is not restrained by positive law. The light thrown upon the subject by the researches of the English record commission led to a change of the views taken by the supreme court of the United States, as originally announced by Chief Justice Marshall in the case of *The Baptist Association* v. *Hart's Executors,* (4 *Wheat.* 1,) and then in the later case of *Vidal* v *Gerard's Executors,* (2 *How.* 127,) by Judge Story, who himself had taken part in the former decision. Since the latter decision, and since the case of *Williams* v. *Williams,* (4 *Seld.* 525,) it seems to be the better opinion that in such. a case as that before us—conceding that the trust is sufficiently expressed—the trustee being a person competent to take— the devise might have been supported and administered in equity as a pious use, if it had taken effect prior to the passage of the statute of 1830, respecting uses and trusts. I shall, at all events, concede thus much for the purposes of the present judgment. The question then is, how the present statute of trusts affects the case. This has been supposed to have been decided by the Court of Appeals, in certain recent cases. I think not, but that the question is still an open one; and if it be so, I agree with my associates, and with

the opinion of Mr. Justice Brown, in the court below, that the weight both of argument and authority is against such trusts, under our present statutes.

In his opinion in the case of *Owens* v. *The Missionary Society of the Methodist Episcopal Church,* Judge Selden says that it has been held by the Court of Appeals in *Williams* v. *Williams,* (4 *Seld.* 525,) that trusts for religious and charitable purposes are not within our statute of uses and trusts, or that concerning perpetuities. This remark, however, is no more than an expression of the individual opinion of the learned judge; and with great deference, I think the decisions of the Court of Appeals have not yet gone so far. Whenever that court shall deliver a judgment covering the whole of this ground we shall of course yield to its authority. But as we understand the state of the law, and the decisions, we feel amply justified in treating as at least an open question the application of our statute of uses and trusts to devises of lands on pious uses.

In the case of *Williams* v. *Williams,* a bill was filed in the court of chancery to set aside certain provisions of the will of Nathaniel Potter of Long Island. The cause was heard before Judge Ruggles, then vice chancellor of the second circuit. He sustained the legatees, and dismissed the bill. From his decree, an appeal was taken, which came to the general term of this court, where it was heard by Justices Barculo, McCoun, Brown and Morse, who *unanimously* held the bequests invalid, and reversed the decree. From this judgment an appeal was taken to the Court of Appeals. In that court the prevailing opinion was delivered with great learning and power by Judge Denio, in favor of reversing the judgment of this court, and sustaining the trusts of the will. With him concurred Judge Ruggles, who heard the cause originally as vice chancellor, Judge Morse, who had concurred in the opposite conclusion in the court below, and Judges Willard and Mason. On the other hand, Judges Gardiner, Johnson and Taggart dissented. Under these circumstances, I think we are justified in restrict-

ing the authority of the case to the precise point decided, while we yield to the reasoning of the opinion that weight and consideration, which belongs not only to its ability, but to the eminent character of its author, which is enough certainly to induce any one to differ from it with great diffidence. But in truth, that case is clearly distinguishable from the present, in its principles and conclusions, and I understand the learned judge who delivered that judgment carefully to avoid even expressing an opinion upon the question which is now presented to us. There were two bequests whose validity were involved in that controversy. The first was a gift of six thousand dollars to the Presbyterian Church at Huntington, to apply the income to the support of their minister, with a direction that such income should be accumulated and not expended until the fund amounted to $10,000. This legacy was held by the Court of Appeals to be valid, but the direction for accumulation to be void. The doctrine of the case is that the provisions of the statutes forbidding perpetuities, or the indefinite suspension of the absolute ownership of personal property, do not apply to trusts created for pious or charitable purposes; although it seems that the court held that the provisions of the same statutes forbidding the accumulation of income do apply to such trusts. The second legacy was of a like sum of $6000 to three individuals, as trustees, to apply one half the interest to the trust specified, and accumulate the residue until the fund reached $10,000, in the same manner as in the case of the former bequest, and after that had been reached, to apply all the income to the education of the children of the poor in Huntington Academy. This legacy was also held to be valid, and, as I read the case, the direction for accumulation was also held void. The first proposition decided by the Court of Appeals was that these legacies, and particularly the latter, about which there was the most difficulty, were valid, independent of the provisions of the revised statutes, as pious and charitable uses, and would be enforced as such in the courts of this country, even where the

statute of 43 Elizabeth had never been in force, or had been expressly repealed. In the next place the court held that the provisions of the revised statutes of 1830, forbidding perpetuities and the creation of expectant estates, or the suspension of the absolute ownership of personal property for more than two lives in being, (1 *R. S.* 773, § 1,) did not apply to this kind of trusts, or to those legacies. The only statutes which come within the scope of this decision relate to personal property. These statutes do not prescribe or restrict the trusts upon which personal estate may be conveyed or bequeathed; nor do they, in terms, forbid any trusts of whatever nature. Their design and effect is to apply rules to the manner in which trusts may be administered, rather than to define the purposes for which they may be made. The applicability of these statutes to the trust before him is discussed by the learned judge, upon principles which have reference to these facts as well as to the character of the trustee in one bequest and the nature of the trust in the other. He assumes that the creation of a trust for such a purpose is not forbidden by any statute. This is the hinge of his reasoning. But that is the very question at issue here. In the absence of any express restriction of the trusts upon which personal property may be applied, the Court of Appeals felt at liberty to take it for granted that no such restriction existed, and that assumption is the foundation of their argument. We do not feel justified in making any such assumption as to trusts of real estate, in the face of a comprehensive and explicit statute upon that subject. At least the two questions must be seen to be wholly different. Judge Denio says, in the outset of his opinion, "both legacies are of personal property only, and both are therefore unembarrassed by some of the difficulties which might attend such dispositions of real estate." We do not, therefore, accept the case as an authority that effect may be given to a devise of lands to a pious or charitable use which is too vague and indefinite in its subject, or its beneficiaries, to vest any estate in the *cestui que trust,* and which is not

McCaughal *v.* Ryan.

within the exceptions to the express abolition of all uses and trusts, contained in the revised statutes.

The case of *Andrews* v. *The Gen. Theol. Sem. of the Prot. Epis. Church*, (4 *Seld.* 559, *n.*) which was decided at the same time, and apparently upon the authority of *Williams* v. *Williams*, was also a case involving personal property only, and in which no opinion was delivered. The subsequent case of *Owens* v. *The Missionary Soc'y of the Meth. Epis. Church*, which has been already referred to, was a case where a testator made a bequest to an unincorporated association whose name implied a religious or charitable object, but without expressing any trust, or otherwise distinctly declaring the design of his bounty. It was held that this bequest was void, because there was not a competent trustee, the society to which the bequest was made not being incorporated at the time of the testator's death, and that its subsequent incorporation did not cure this defect. I do not understand Judge Selden as giving a distinct opinion that a sufficiently definite trust could be implied from the name and declared objects of the legatee, to sustain the bequest; even if there were a competent legatee or devisee to the use; although he assumes this to be so, for the purposes of his argument. It is obvious that this judgment of the Court of Appeals will afford little, if any, assistance in deciding the present question. In noticing this case, I cannot refrain from adding my hearty concurrence in the forcible remarks of Judge Selden in his opinion, as to the impolicy of attempting, either by legislation or strained judicial construction, to create or uphold a partial or exclusive system applicable to these particular interests which are styled pious or charitable uses, or the persons or bodies by whom they are to be administered, in violation of our settled rules of general law and public policy as to the creation and tenure of estates. If a departure from this policy be accomplished by a course of judicial decisions, it must ultimately be terminated, as Judge Selden remarks, by stringent legislation, and it seems to me that this will be not only a remedy for the

evil, but at the same time a rebuke to the course of decisions which shall introduce it.

The case of *Tucker* v. *St. Clement's Church*, (4 *Seld.* 558, *n.*) was decided at the same time with *Williams* v. *Williams*, and the judgment of the superior court affirmed. That was a case of a conveyance of real estate, and at first consideration might seem to be in point, upon the question now before us. But in truth it presented a totally different question. No opinion is given in the Court of Appeals, but the case is reported in the superior court, in 3 *Sandf. S. C. Rep.* 242. That court expressly declined to express any opinion upon the questions whether the English law of charitable uses was in force in this state, prior to the revised statutes, and if so, whether it was abrogated by the provisions concerning uses and trusts and perpetuities, contained in those statutes. It was not necessary to decide either question; and we cannot suppose that the Court of Appeals, in affirming the judgment rendered in the court below, meant to do what was not needful to that judgment, and was intentionally omitted by the court that gave it.

The action was brought to set aside a conveyance of lands, made directly to St. Clement's Church, for the support of its minister for the time being. The conveyance was sustained by the superior court, on the ground that the church, as a corporation, was authorized by the statute under which it was organized, to take and hold lands within a certain limit, which was not exceeded in this instance, for the use of such church &c., or for certain other pious uses, and that the support of its minister was a pious use contemplated and permitted by the statute. The case was therefore relieved of all difficulty by this statute as an enabling act, which authorized the corporation to hold lands to the extent of those conveyed in that instance and for the object specified; a statute which was not repealed or affected by the general statutes of trusts or perpetuities. Obviously that case was upon different grounds from the present, and is not an authority to sustain such a

McCaughal *v.* Ryan.

devise as that before us. It may be added that the opinion in this case, in the superior court, was delivered by Mr. Justice Duer, who, in the case of *Ayers* v. *The M. E. Church,* (3 *Sandf. S. C. Rep.* 371,) has discussed the application of the statutes of uses and trusts and of perpetuities to trusts for pious and charitable purposes with great force and directness, and has given the weight of his authority, not only as a judge but as one of the authors of the statutes in question, to the conclusion that as matter of legislative intention, as well as judicial construction, these statutes do apply to trusts of this description.

I think it is obvious from the examination of these cases in the court of last resort that no adjudication of the question now before us has been made by that tribunal. I will consider presently, and very briefly, whether the reasoning of the opinions delivered in that court, with which we are furnished, leads necessarily to the conclusion that devises of lands to pious and charitable uses are not affected by the revised statutes. Before doing so, I will advert to the cases in which this question has been considered, and in some of them decided, in the court of chancery and in this court. Perhaps, to use the language of Judge Denio in delivering the opinion in *Williams* v. *Williams,* these cases "*being in courts of original jurisdiction may not be availed* of as precedents" even in this court. To my mind indeed their weight would seem to be lessened, not so much because they are decisions of courts of original jurisdiction, as because from the present subdivision of this court, into numerous co-ordinate tribunals and the consequent conflict in its decisions, even in their most authoritative form, it is no longer possible to say what shall be considered a precedent, except a judgment from which there can be no appeal. It would, however, be incorrect to say that upon the question we are now considering there is any conflict among the decisions, however the opinions of judges, incidentally expressed, may disagree. In every case where the point has been presented for distinct adjudication, in the

courts of this state, it has been held that the prohibitions of the revised statutes do apply to devises of lands to pious and charitable uses.

In *Yates* v. *Yates*, (9 *Barb*. 324,) the supreme court, sitting in the third district, held that a devise of real estate for a pious or charitable use was now invalid; that no trust could be created, under the revised statutes, for these, any more than for other objects, except those expressly authorized. Judge Wright, in giving the opinion of the court in that case, said all that can probably be said to much purpose upon the construction and application of the terms of the statute, and his associates, Judges Parker and Watson, concurred in his views. In the subsequent case of *King* v. *Rundle*, the same court, in the same district, again had the question before them, and adhered to their opinion. Judges Harris and Parker, who heard this case, with Judge Wright, assenting. I have been unable to find any other adjudication in our courts upon a devise of lands to what is styled a " pious use," since the statute. I have already referred to the cases in the superior court. I may add, that I think the case of *Tucker* v. *St. Clement's Church*, has been somewhat misunderstood in subsequent cases. It is evident, as I have already shown, that this case is not in conflict with the views expressed by Judge Duer in the subsequent case of *Ayres* v. *The Meth. Episcopal Church*, and that the former opinion does not countenance the doctrine that the statute has no application to charities, as was supposed by Judge Paige in *Voorhees* v. *The Presbyterian Church of Amsterdam*, (8 *Barb*. 135.) This latter case is not an authority for such a proposition, since it was not necessarily involved in the decision. It is true that Judge Paige declares that to be his opinion, but that opinion was disapproved, when the case came up on appeal, by Judge Hand, and no dissent was expressed from his views by his associates, Judges Cady and Allen. (*See* 17 *Barb*. 103.) It must be admitted, I think, that these cases in this court and in the superior court present at least an array of individual opinions which are en-

McCaughal v. Ryan.

titled to some weight as such, if they cannot be used for any thing more.

On the other hand, the late Vice Chancellor Sandford very strenuously supported the opposite view, although in the only case in which his opinion is expressed the point in question was not involved, and his remarks were therefore *obiter dicta.* The case is *Shotwell* v. *Mott,* (2 *Sand. Ch. Rep.* 46.) There also the gift was not of land, but of the proceeds of land, absolutely directed to be converted into money. The bequests therefore were, as Judge Sandford says, (page 53,) mere legacies of personal property. The learned vice chancellor, however, urges several reasons why charitable uses should not be considered within the statute, and these deserve notice, because they have some real and more apparent force; especially when backed by so high an authority. It is said that charitable uses cannot be held to be cut off by our statute of uses and trusts, any more than they were in England by the statute of 27 Henry 8, chapter 10. But I think the learned judge overlooked the manifest difference, not only in the phraseology but in the scope and import of the two statutes. The statute of Henry 8 enacts, that " when any person shall be seised of lands, &c. to the use of any other person or body politic, the person or corporation entitled to the use &c., shall be seised of the land &c., of the like estates as they have in the use, and that the estate of the person so seised to uses shall be deemed to be in them that have the use in such quality, &c. as they before had in the use." The statute therefore executed the use, making *cestui que use* complete owner of the lands both at law and in equity.

But charities were a class of trusts in which the *cestuis que use* were altogether indefinite. They were not only too uncertain to take a legal estate, but the courts of equity were compelled to administer this class of trusts by special rules and upon a system founded on the determinate character of the beneficiaries. In effect there is no *cestui que use* in such cases, and it is manifestly impossible for the statute to execute

such uses. This being so, it is not a forced construction to hold that it could not affect them. But the revised statutes of our state begin their enactments upon the law of uses and trusts by the broad provision that " Uses and trusts, except as authorized and modified in this article, are abolished." When this law was passed the statute of uses was in force in this state, and all uses which came within its scope were already executed by force of its provisions. The legislation of 1830 went beyond this. Its design, as well as its effect, was not only to execute uses, but to abolish trusts, except such as are expressly specified and saved.

Judge Sandford also urges that the frame of the statute of 1830, and the notes and reports of its authors, show that it ought to be confined in its operation to private or individual trusts. I shall recur to this argument presently, but it may not be amiss to notice, here, the classification which the revisers made of trusts as they found them. They say there are three classes of trusts ; first, formal trusts, where the trustee has the mere naked legal title, and the beneficiary has the entire right to possess and enjoy the profits. Trusts of this description they intended to abolish, converting such as existed into legal estates, and forbidding them in future. Then there were implied trusts, and these they admitted to be unavoidable in administering the law for the prevention of fraud. The other class of trusts was active trusts, in which the trustee needs and holds the legal estate with the power and subject to the duty of management, and control of the profits. These trusts are both useful and necessary, but they are proper subjects of regulation and restriction ; and provision is made accordingly. Now do not all charities fall within the first or the last of these classes, and are they not liable to some at least of the objections, and to most if not all the mischiefs, pointed out by the authors of the statute in question, as well as to greater evils which would result from the retention in this country of the system of landed estates which is embedded in the framework of society and government in our mother

McCaughal *v.* Ryan.

country, but which has been abolished as entirely out of place among us? When the revisers, and the legislature which adopted their recommendations, declared their purpose not only by the statute, but in the explanations which accompanied it, to put an end to all formal trusts, and to limit active trusts to such as are specified, are we to say that it was not intended to include trusts for charitable or religious purposes, and this merely because they are supposed to be religious or charitable? I have yet to learn that such trusts or devises are in any respect more meritorious than such as are prompted by the call of duty or the claims of affection, and I can see no other reason why those who desire to devote their property to such purposes should not comply with the legislation, and conform to the policy, of the state. A man cannot provide for the education or the maintenance of his own children or descendants, except in the mode which the law sanctions. He cannot lock up his estate and establish a perpetual fund to clothe them, or to teach them learning, or morals, or religion. He must submit to what the state deems wisest. and best for the whole of its citizens, if he desires to provide for those of his own blood and kin. Why should he be allowed any greater latitude in providing for the children of other people, or for the welfare of persons who have no claims upon him? I must recur for a moment to the prevailing opinion in the Court of Appeals in *Williams* v. *Williams,* in order to show, what I think is quite obvious, that it does not follow from the reasoning of that opinion, adopting the whole of it which relates to the present statutory regulations of the state, (*see* 4 *Seld.* 535, 554,) that this devise should be sustained. I understand the reasoning, upon that part of the case, of the very eminent judge who delivered that opinion, to be mainly, that charitable uses existed as a distinct and recognized class of trusts admitted and enforced by the courts at the time when the judicial legislation of the English chancery, and the express statutory enactments of our own state forbidding perpetuities, were promulged or adopted. And that being from their nature neces-

sarily incompatible with these subsequent regulations, they must be considered as forming a tacit exception to them. It is said that trusts for these objects existed and were enforced under the English law as a tacit exception to the doctrine established by their courts, as to perpetuities, and that the same trusts were recognized in our courts, and must be considered as a like exception to the statute forbidding trusts or dispositions of personal property to be so constructed or made as to create perpetuities, or to fetter the power of alienation beyond certain limits. The legislature did not abolish or forbid the creation of such trusts, that is, of dispositions of property in trust for such objects. Yet it is urged these trusts would be impossible under the stringent rule of the statute as to perpetuities; such a rule is incompatible with their existence, if indeed its terms do not point out that it was intended to apply exclusively to another class or kind of trusts for the benefit of individuals severally or successively, and in which life or lives is therefore an essential element as to their term of continuance. Therefore the learned judge argues the legislature must have intended to recognize, and not to interfere with, bequests to such uses as are known as pious and charitable in any form in which they would have been sustained by the courts. These considerations are enforced by an argument from the scope and language of the statutes themselves, by their use of life or lives as a term of restriction, and by the general purport of the act. It is quite plain, I think, that this reasoning proceeds upon the assumption that there is no explicit prohibition, in the statute, of a trust for the object specified. That being so, the argument has pertinency and power; that not being so, we must be introduced to a different question, upon which widely different considerations are to be brought to bear.

Here is a devise of lands to what is claimed to be a pious use, and the question is whether when the statute of uses and trusts declares that " all uses and trusts, except such as are authorized in that article, are abolished," (1 *R. S.* 727, § 45,) this trust estate in lands, which is not one of those authorized

McCaughal *v.* Ryan.

by the statute, can be sustained, and allowed to be expressly declared by will, because it is a charity. This is asking us, not to decline to extend a restrictive statute, as was contended in the instance of trusts of personal property, but to dispense with the clear and sweeping terms of a general law. In my humble judgment, to declare such a rule—to create such an exception—would be, in the language of Judge Duer in the case already quoted, (3 *Sand. S. C. R.* 371,) " an unjustifiable, if not unexampled stretch of judicial power." The language of the legislature in the section in question is unequivocal and unlimited. It is as clear and emphatic in itself as it could be made, and I can discover nothing in the residue of the chapter, or in any part of the legislation of which it forms a part, to demand such an exception as we are now called upon to introduce.

It is said that the statute of uses and trusts applies only to trusts for the benefit of designated individuals, springing from interested motives—to what are styled private trusts—and not to trusts for the benefit of classes of persons, dictated by piety or charity, and which it is said can be distinguished as public trusts. I cannot discover any evidence of such an intention on the part of the framers of the statute in its broad and sweeping phraseology, and I think such a construction of the legislative will is contradicted by the exceptions which were thought necessary, and were incorporated with the revised statutes, or have been subsequently made in favor of certain particular cases of trusts for purposes of education, religion and charity. Some of these enabling acts are cited by my associate, and others will readily be found, upon examination of the statute books. They certainly afford the strongest confirmation to the opinion that the plain and literal interpretation of the statute is the true one, and that if the interests of religion, learning or charity demand exceptions, they must be made by the legislature. Uses and trusts, that is, all uses and trusts except as modified and authorized in the statute, are abolished, and every estate or interest in lands is to be

deemed a legal right, except when otherwise provided. Can any thing be plainer or more comprehensive? All uses and trusts in which the legal estate is to be in one person and the right to the profits in another, are to be swept away by vesting the legal estate, with the equitable interest, in the *cestui que trust*. That cannot be in such cases as were formerly sustained as pious uses, or like the one before us, for the want of certainty, or legal capacity in the beneficiary. If such a trust as this is sustained, therefore, it must be as an express and active trust. These are abolished, except in certain specified cases, which it is admitted cannot be made to include any such trusts as that before us. And the argument is that because the permitted trusts are of a wholly different nature, and afford no opportunity for the creation of these undertakings for religion or benevolence, therefore the latter must be excepted from the prohibition of the law. The sum of the argument is, because pious uses are not mentioned among the exceptions they cannot be included in the prohibition. Is it just reasoning to limit the prohibitory clauses by the exceptions; to look for the matter of the statute to the latter alone, and to confine the former to trusts for the personal and pecuniary advantage of designated individuals, because the latter have that scope only. I admit that the words of a statute are to be limited to its subject matter, but I cannot agree that the subject matter of a comprehensive enactment—part of an enlarged system of general law and public policy—is to be measured or determined by the scope of the exceptions from its terms.

I have used the words public and private trusts as I find them in the arguments and opinions by which charities are sustained under the present statute, as they existed before its passage. It seems to me, however, that in this country it will be difficult to establish and uphold any classification of trusts into public and private, which will answer the purpose of an exception in terms in the statute, or by which such a trust as that before us would logically and necessarily be in-

McCaughal *v.* Ryan.

cluded within the former class. By the English court of chancery charities and public trusts are regarded as synonymous expressions, and both are regulated and restricted by the enumeration of uses in the statute 43 Eliz. (*see* 2 *Myl. & Cr.* 618; 1 *Bro.* 14; 7 *Ves.* 423.) Whatever gifts or devises come within the purview of that statute are recognized as gifts to purposes of public concern and utility. But with us a distinction between trusts for public and for private uses must be founded upon the greater or less number of persons to be benefited ; or it must confine " private trusts" and thus limit the operation of the statute to trusts for the mere pecuniary interest of the *cestui que trust ;* or it must introduce an arbitrary and uncertain division. The Roman Catholic Church is known in our law only as a private body or denomination of christians, or of persons associated for the maintenance of certain ceremonies and modes of worship, and the promulgation of a certain form of religious belief. It is true these are objects in which a large number of persons are interested, and which they think are of vital concern to the whole community; but they are not objects in which the whole community are agreed that they have an interest ; nor can our courts judicially pronounce that the support of this, or of any other, church or creed is a matter of public concern ; or discriminate between piety and superstition, between orthodoxy and heresy, between true and false religion. Indeed, as toleration and protection are extended by our laws not only to all forms of christian doctrine and polity but to all religions whatever, I cannot discover any reason why the authority of our tribunals should not be invoked to sustain a devise or a bequest for a Mormon temple, a Shaker settlement or a Jewish synagogue as a *pious* use, just as much as a fund or a devise devoted to the support of a Roman Catholic monastery or a protestant church. Provision for the support of a belief or a worship, which in England, from which country this system of pious uses is to be derived, would be denied the countenance of the law as supertitious or false, must have pre-

cisely the same right to be considered a pious use with us, as any other, and the only test which can be applied, consistently with our form of government and laws, to trusts claiming this character, will be that they should be devoted to that which is supposed by their founders to be the true religion, whatever it may be. This view of the subject is put with great force by Judge Duer in *Ayres* v. *The Methodist Episcopal Church,* (3 *Sandf. Sup. C. Rep.* 377, 8,) and serves to show how incongruous as well as unnecessary in this country the exemption of religious trusts from the general legislation of the country would be. The same considerations go far to show that where there is no one form of religion recognized and sanctioned by the state as the truth, where all churches, whatever their own pretensions may be, and however widely they may differ, are in the view of the law but so many sects or denominations of christians, the support of any one sect or form even of christian doctrine, discipline or worship, cannot be considered in legal strictness, or with logical propriety, a public trust.

I will add one or two other considerations which seem to me to be entitled to some weight. It was plainly and avowedly the design of the statute of uses and trusts, in the revision of 1830, to sweep away all that kind of trusts which in the classification of Mr. Humphreys to which the revisers referred, are described as "*passive*" trusts. (*Humphrey on Real Property* 16, 17. *Revisers' Notes to* 1 *R. S.* 727, §§ 45 *to* 50.) Wherever a trustee or grantee was interposed as a mere holder of the title, with no powers to exercise and no duties to discharge, it is the policy of the law and the design of the statute to unite the legal and equitable estates, to vest the title immediately in the *cestui que trust,* and to do away with the phantom of an owner who held such a mere nominal title. If the trust created or attempted to be created by the will before us is not in strictness a merely passive or formal trust, it is on account of the indefiniteness and uncertainty of the beneficiary. There are, obviously, no duties

prescibed to the trustee, and there is no application of the rents and profits directed. If the devisee in this will was not a merely formal holder of an estate whose profits and proceeds others are entitled directly to take and enjoy, it is because those others cannot be legally ascertained, or have no legal existence. It is no doubt true, that this prevents the application of those portions of the statute which are intended to convert uses and trusts into legal estates. But at the same time it prevents the application of those restrictions which are applied by the legislature to the acquisition and enjoyment of property by corporate bodies, ecclesiastical and others, and their accumulation for the very purposes that are styled "pious uses." But there may be trusts for pious or charitable purposes in which the beneficiaries are designated, or at least determinate and possessing actual and legal existence. The exception which is to allow the one must tolerate the other also. The statute is to be restricted to trusts for the benefit of designated individuals, and of the same nature and character as those specified in the exceptions which it makes. But colleges, hospitals, churches, seminaries or their inmates and members are the frequent objects of devises for what are styled pious or charitable objects, the intended recipients of the profits or income of the lands devised, and that it may be under a trust as merely formal and passive as can be contrived. The result is to be that such corporations are to enjoy what the settled policy of the state has denied to its citizens in their individual concerns, and a class of trusts which the statute intended to extirpate altogether is to reappear in a widely extended field, and to escape the effect of a prohibition which would seem to have been as universal in design as it is in terms.

Again; the legislature has provided for the devolution of the trust estate upon the death of the trustee of "an express trust;" that is, of all express trusts. (1 R. S. 730, § 68.) Neither the heirs nor the personal representatives of the trustee are to meddle with the trust estate, but the court are

authorized to appoint a successor, who is to discharge the duties of the trust under the direction of the court. It is, I think, obvious that these provisions cannot be made applicable to mere passive and formal trusts, and if not, then the whole class of charitable trusts, whether active or passive, (both being retained as exceptions to the law,) must be an exception to the rule of descent or devolution of trust estates introduced by the statutes of 1830. These trusts and trust estates continuing must continue subject to all the mischiefs and uncertainties which the legislation that I have cited was intended to remedy. (*See Revisers' Notes to* § 60.)

The provisions to which I am now adverting seem to me to be part of an uniform and coherent system, of a well considered general law of trusts. I see no reason why they are not as well applicable to trusts for objects of religion and charity as to any other. But I can discover no principle upon which these provisions can be applied, and the residue of the chapter withheld from such trusts. If these regulations are imposed by the statute upon all trusts, then all trusts are subject to its prohibitions and restrictions, and not only all passive but all active trusts except those specified, are forbidden. If the latter are to be construed not to relate to charities, then these wise regulations must also necessarily be inapplicable, and then the considerations to which I have just adverted may, perhaps, aid us to see how wide is the exception to the public law and policy of the state which we are thus tacitly to introduce.

But the legislature have not only made the language of the statute of uses and trusts as strong and comprehensive as possible; they have also interposed a barrier to the accumulation of landed property in the hands of corporations, who are, in many, if not most, and may be in all cases, the subjects and recipients of these charitable benefactions, by the exception in the statute of wills. (2 *R. S.* 57, § 3.) No corporation is permitted to take lands by devise, unless expressly authorized by its charter. The amount or extent to which

McCaughal *v.* Ryan.

each corporation may hold lands, is defined by the charter, and thus the legislature has reserved and exercised the power of preventing the accumulation of large masses of landed property in the hands of such bodies. Entailments by individuals upon their families or their children are abolished and prohibited by our laws and policy, and it cannot be doubted that one object of the legislation in regard to corporations was to prevent their acquiring and retaining any other lands than such as were required for their immediate purposes of public worship or public charity or the like, and to prohibit such overgrown and inalienable estates, as well in the hands of trustees or corporations for charitable or religious objects as in those of individuals. If the holding lands for revenue is permitted in special cases, it is only to a limited amount, such as will not be felt in the public policy of the state. There is nothing, I apprehend, in the history of this, more than can be found in that of other countries, which should induce us to relax any of the restraints thus imposed upon corporations, even if they be ecclesiastical or charitable, or upon gifts to charitable uses, however pious or meritorious their apparent design. Large landed endowments among us, even for the best objects and though supposed to be in the best hands, do not commend themselves to impartial observers by commensurate benefits to the state, their corporators, or the great objects of religion and beneficence which they may have been created to serve. If permitted they become obviously a marked exception to our whole system of laws, regulating the ownership, disposition and descent of lands, and an exception which is not called for by any necessities of society or of individuals. It has indeed been made a question by wise men whether as a general rule, and subject, perhaps, to some necessary exceptions, the support of both religion and charity are not better left to the discretion and the voluntary activity of the people themselves. However this may be, the restrictions which I have mentioned stand at least to forbid excesses in these directions, however well designed, and to in-

dicate that such excesses may be expected, and ought to be restrained. But if a rule shall be introduced which shall repeal the statute of uses and trusts as to such devises as the present, or make them an exception to its terms, it is manifest that all those barriers will be swept away, and these provisions in effect abolished at a blow. Of what avail will it be to forbid a devise to a corporation, if a trust shall be sustained, which, in effect, if not in name, itself creates a corporation and locks up lands to any extent, to be forever inalienable and in lifeless hands; or if a devise can be made to an individual in trust for the benefit of a corporation or its members and be valid? For, as I have already said, these charities are in many instances, and they may be in all, administered by corporations, churches, hospitals, societies, seminaries and the like, all forbidden to take, or restricted in holding, real estate absolutely, and yet to be permitted to be beneficiaries or *cestuis que trust*, of charitable devises to an unlimited extent, if the rule now contended for is to intervene, even to this limited extent. And the mischiefs arising from such accumulations of lands, which have led to the restrictions upon corporations, would obviously be greater if such lands were taken subject to a perpetual trust, than if they were simply held by such bodies as absolute owners like individuals. But this is not all which is claimed in favor of charitable uses. It has been held by high authorities, as a consequence of the doctrine of charities, without, however, having considered, as far as I am aware, the effect of the statute of uses and trusts, which we have been discussing, or else before its passage, that corporations may be trustees or devisees to charitable uses to any extent, notwithstanding the exception in the statute of wills, or prohibitions in charters. And yet, as I have said, and as has been well shown by the lamented Judge Duer, in the opinion I have so often quoted, a corporation will, in effect, be created by the devise in trust, itself, in every such case, and the lands locked up in its possession beyond the power of alienation or control. And still farther, if the view taken by the

McCaughal *v.* Ryan.

presiding justice, of the effect of such a devise as the present to an ecclesiastical person by his name of office, be correct, and such a devise be sustained, these ecclesiastical officers may obtain that perpetual succession and transmission of lands conveyed to them which they have heretofore been denied, and the want of which may have compelled them to leave the title in the churches or corporations themselves, subject to the general laws and policy of the state affecting such corporations.

In short, if I do not misconstrue the doctrine which is now earnestly contended for, to sustain such devises as that before us, and which recent cases of high authority are supposed to favor, it would be a marked step backward, leading to the overturn of the settled policy of the state upon these questions.  I think such a course must eventually bring after it a retribution and a corrective, in statutes of mortmain and similar stringent remedies.  The evils at which these are aimed are no less evils than they always have been.  They are not less palpable to reflecting men, because the supposed tendency of the general opinion of the world is in an opposite direction, and to what are supposed to be opposite errors.  All this, and all the increase and diffusion of intelligence and social science of which we boast, have been found insufficient to prevent these mischiefs in our mother country.  Within a little more than a hundred years it has been found necessary to enforce the policy of the realm in this regard, and to protect the interests of its subjects by the present statute of mortmain. (9 *Geo.* 2, *ch.* 32.)  In truth the motives to which these pious and charitable donations, or those who ask them, appeal, are the most powerful in the human heart, and the time when they are often demanded is the moment of greatest sensibility to religious hopes and fears and to the assumed or admitted power of those who wield them, accompanied, we may often apprehend, by an unjust indifference to other claims of at least equal merit and at least equally pressing necessity. If the state is to exercise any control over the tenure and dis-

position of the property, and especially the landed property, of its citizens, I am convinced that here is not the point at which that control is to be laid aside or relaxed.

It is impossible not to be reminded by the controversy to exempt charities from our law of trusts, how uses were originally borrowed from the civil law by ecclesiastics, to evade the restrictions in the English law upon their acquisitions, and of the long struggle and continued exhibitions of clerical ingenuity, of judicial astuteness, and of legislative resolution in English legal history, in which this contrivance made so prominent a feature. The introduction or the restoration of charitable uses as an exception to our explicit and criminal statutory rules, limiting trusts in lands, would be, it seems to me, just as plain an evasion not only of that statute but in effect of others to which I have referred, and as manifest a departure from the true interests as well as the settled policy of our communities, as can be found contrived by ecclesiastics or lawyers in all that history. I think it would be an unnecessary, as well as an unhappy, departure from both the spirit and the letter of our laws. There is no charity which cannot obtain the benefits of a charter to promote its objects; and religious, literary and benevolent societies are permitted to become incorporate, simply by the observance of certain forms. The right to hold lands and receive their income is thus conferred and at the same time regulated and restricted, and it is enough for all purposes of private bounty, as well as for the higher object of the public good, that gifts should be made directly to these bodies, under the control of the law and within its wise limitations.

The trust in this case being void, the devise failed, and the plaintiff should have had judgment. The judgment of the court below must be reversed, and a new trial ordered.

BIRDSEYE, J. Although I fully concur in the general views of this case so well expressed by the presiding justice, and in the conclusions to which he has arrived, I am reluctantly con-

strained to dissent from one intimation thrown out by him; and shall state my views very briefly on that point.

I agree that the terms of the devise to Bishop Hughes show a clear design in the testator to give him the fee of the land in question; and that, if the devise is valid, the fee passed to the devisee. But I cannot admit that, because the devisee is described as an ecclesiastical officer, and the donation is made to him in his name of office, the fee vests in him and passes to his successors in office. It would descend, in such a case, in my judgment, to the heirs at law of the devisee. The title prefixed to the name of the devisee is as much a *descriptio personæ*, as his place of residence which is subjoined. If a devise to one who holds an ecclesiastical office, describing him by his name of office, would give a fee to him and to his successors in the office, it must be because they would constitute an ecclesiastical corporation sole, such as is described in 1 *Black. Com.* 496,7. The English law, as there stated, did make a parson or vicar a corporation, for the reasons and purposes there indicated.

But neither that rule of law, nor the reasons on which it is founded, ever existed in this state, so far as my knowledge extends. There has never been any established church; nor any endowment of parish or other churches, of any denomination. The freehold of the church, church yard, parsonage or glebe, were never vested in any ecclesiastical officer as a temporal recompense to him for his spiritual care of the inhabitants, and with the intent that the same emoluments should ever after continue as a recompense for the same care. To avoid the difficulties which would have resulted, if the freehold had vested in the parson in his natural capacity, so as to descend to his heirs or be liable to his debts, the law of England ordained that the parson, *quatenus* parson, should never die, any more than the king; by making him and his successors a corporation. But we have no more ordained that rule in this state, in reference to the officers of our churches or religious societies, than we have in regard to the governor.

McCaughal *v.* Ryan.

Certainly no instances were pointed out on the argument, where the minister of a church or any officer of a religious society within this state, has been seised of parsonage or other lands, in right of his parish, or office. When such a case occurs, it will be time to inquire whether on the death of the incumbent, the fee will pass to his heirs at law, or his successors in office.

But even in England, such a devise as the one in question would not have conveyed the fee of the land to the devisee and his successors, as a corporation sole. To do that it was indispensable to make use of the word *successors.* (*Co. Litt.* 8 *b*, 9 *a.*) " For," says Coke, " if lands be given to a *sole* body politique or corporate, (as to a *bishop*, parson, vicar, master of an hospital, &c.) there to give him an estate of inheritance in his politique or corporate capacitie, he must have these words, To have and to hold to him and his successors : for without these words *successors*, in those cases there passeth no inheritance."

The rule is different as to a corporation aggregate. (*Co. Litt.* 94 *b.*) For that body never dies. But in the case of a sole corporation, as a bishop, parson, &c. the decease of the incumbent creates a vacancy or hiatus in the office, and the succession does not take place, till an independent body has appointed the successor.

While, therefore, it seems clear, that the will under examination shows an intention to pass the whole interest of the testator, and so, if valid, carried an estate of inheritance, (4 *Kent's Com.* 602, 8*th* ed.,) I think that estate would vest in Bishop Hughes and his heirs at law, and not in him and his successors in office.

Judgment reversed, and new trial granted.

[DUTCHESS GENERAL TERM, April 14, 1857. *S. B. Strong, Emott* and *Birdseye,* Justices.]